**Krystal S. ETSITTY, Plaintiff–Appellant,**

v.

**UTAH TRANSIT AUTHORITY; Betty Shirley, in her individual and official capacities, Defendants–Appellees.**

**American Civil Liberties Union; American Civil Liberties Union of Utah; Lambda Legal Defense and Education Fund, Inc.; National Center for Lesbian Rights; National Center for Transgender Equality; The Transgender Law and Policy Institute; Transgender Law Center; Equal Employment Advisory Council, Amici Curiae.**

No. 05–4193.

United States Court of Appeals, Tenth Circuit.

Sept. 20, 2007.

Erik Strindberg (Ralph E. Chamness and Erika Birch, with him on the briefs), Strindberg Scholnick & Chamness, LLC, Salt Lake City, UT, for Plaintiff–Appellant.

Scott A. Hagen (Michael E. Blue with him on the brief), Ray Quinney & Nebeker, Salt Lake City, UT, for Defendants–Appellees.

Rose A. Saxe and James D. Esseks, American Civil Liberties Union Foundation and Lesbian & Gay Rights Project, New York, NY; Margaret Plane, American Civil Liberties Union Foundation of Utah, Inc., Salt Lake City, UT; Cole Thaler, Lambda Legal Defense & Education

Fund, Inc., Atlanta, GA; Shannon Minter, National Center for Lesbian Rights, San Francisco, CA, on the brief for American Civil Liberties Union, American Civil Liberties Union of Utah, Lambda Legal Defense & Education Fund, Inc., and National Center for Lesbian Rights; as Amici Curiae in Support of Plaintiff–Appellant.

Kathryn Kendell, San Francisco, California, and Christopher W. Daley, Transgender Law Center, San Francisco, CA, on the brief for National Center for Transgender Equality, Transgender Law and Policy Institute, and Transgender Law Center as Amici Curiae in Support of Plaintiff–Appellant.

Ann Elizabeth Reesman and Laura Anne Giantris, McGuiness Norris & Williams, LLP, Washington, DC, for Equal Employment Advisory Council, on the brief for The Equal Employment Advisory Council as Amici Curiae in Support of Defendants–Appellees.

Before HENRY and MURPHY, Circuit Judges, and FIGA,* District Judge.

MURPHY, Circuit Judge.

## I. Introduction

Krystal Etsitty, a transsexual and former employee of Utah Transit Authority ("UTA"), sued UTA and Betty Shirley, her former supervisor, pursuant to 42 U.S.C. § 2000e–2(a)(1) ("Title VII") and 42 U.S.C. § 1983. In her complaint, she alleged the defendants terminated her because she was a transsexual and because she failed to conform to their expectations of stereotypical male behavior. She alleged that terminating her on this basis constituted gender discrimination in violation of both Title VII and the Equal Protection Clause of the Fourteenth Amendment. The defendants filed a motion for summary judg-

ment and the district court granted the motion. In doing so, it determined transsexuals are not a protected class for purposes of Title VII and the prohibition against sex stereotyping recognized by some courts should not be applied to transsexuals. It also concluded that even if a transsexual could state a Title VII claim under a sex stereotyping theory, there was no evidence in this case that Etsitty was terminated for failing to conform to a particular gender stereotype. Etsitty appeals the district court's order granting summary judgment to the defendants. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the district court's grant of summary judgment.

## II. Background

Etsitty is a transsexual who has been diagnosed with Adult Gender Identity Disorder. Although Etsitty was born as a biological male and given the name "Michael," she identifies herself as a woman and has always believed she was born with the wrong anatomical sex organs. Even before she was diagnosed with a gender identity disorder, Etsitty lived and dressed as a woman outside of work and used the female name of "Krystal." Eventually, Etsitty began to see an endocrinologist who prescribed her female hormones to prepare for a sex reassignment surgery in the future. Etsitty made the decision at that time to live full time as a woman. While she has begun the transition from male to female by taking female hormones, she has not yet completed the sex reassignment surgery. Thus, Etsitty describes herself as a "pre-operative transgendered individual."

Nearly four years after Etsitty had begun taking female hormones, she applied

---

* The Honorable Phillip S. Figa, District Judge, United States District Court for the District of Colorado, sitting by designation.

for a position as a bus operator with UTA. She was hired and, after successfully completing a six-week training course, was assigned to a position as an extra-board operator. As an operator on the extra board, Etsitty was not assigned to a permanent route or shift. Instead, she would fill in for regular operators who were on vacation or called in sick. As a result, Etsitty drove many of UTA's 115 to 130 routes in the Salt Lake City area over approximately ten weeks as an extra-board operator. While on their routes, UTA employees use public restrooms.

Throughout her training period at UTA, Etsitty presented herself as a man and used male restrooms. Soon after being hired, however, she met with her supervisor, Pat Chatterton, and informed him that she was a transsexual. She explained that she would begin to appear more as a female at work and that she would eventually change her sex. Chatterton expressed support for Etsitty and stated he did not see any problem with her being a transsexual. After this meeting, Etsitty began wearing makeup, jewelry, and acrylic nails to work. She also began using female restrooms while on her route.

Shirley, the operations manager of the UTA division where Etsitty worked, heard a rumor that there was a male operator who was wearing makeup. She spoke with Chatterton and he informed her Etsitty was a transsexual and would be going through a sex change. When Chatterton told her this, Shirley expressed concern about whether Etsitty would be using a male or female restroom. Shirley told Chatterton she would speak with Human Resources about whether Etsitty's restroom usage would raise any concerns for UTA.

Shirley then called Bruce Cardon, the human resources generalist for Shirley's division, and they decided to set up a meeting with Etsitty. At the meeting, Shirley and Cardon asked Etsitty where she was in the sex change process and whether she still had male genitalia. Etsitty explained she still had male genitalia because she did not have the money to complete the sex change operation. Shirley expressed concern about the possibility of liability for UTA if a UTA employee with male genitalia was observed using the female restroom. Shirley and Cardon also expressed concern that Etsitty would switch back and forth between using male and female restrooms.

Following their meeting with Etsitty, Shirley and Cardon placed Etsitty on administrative leave and ultimately terminated her employment. Shirley explained the reason Etsitty was terminated was the possibility of liability for UTA arising from Etsitty's restroom usage. Cardon similarly explained to Etsitty that the reason for her termination was UTA's inability to accommodate her restroom needs. Shirley felt it was not possible to accommodate Etsitty's restroom usage because she typically used public restrooms along her routes rather than restrooms at the UTA facility. Shirley also testified she did not believe it was appropriate to inquire into whether people along UTA routes would be offended if a transsexual with male genitalia were to use the female restrooms. On the record of termination, Shirley indicated Etsitty would be eligible for rehire after completing sex reassignment surgery. At the time of the termination, UTA had received no complaints about Etsitty's performance, appearance, or restroom usage.

Etsitty filed suit against UTA and Shirley, alleging they had engaged in unlawful gender discrimination, in violation of Title VII and the Equal Protection Clause of the Fourteenth Amendment. She claimed she was terminated because she was a transsexual and because she failed to con-

form to UTA's expectations of stereotypical male behavior. The defendants filed a motion for summary judgment, arguing transsexuals are not a protected class under Title VII or the Equal Protection Clause and that Etsitty was not terminated for failing to conform to male stereotypes. The district court granted the motion. In doing so, it agreed transsexuals are not a protected class and concluded there was no evidence that Etsitty was terminated for any reason other than Shirley's stated concern about Etsitty's restroom usage.

## III. Analysis

■ This court reviews a district court's decision to grant summary judgment de novo. *Green v. New Mexico*, 420 F.3d 1189, 1192 (10th Cir.2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In making the determination of whether summary judgment was appropriate, this court views all the evidence and draws all reasonable inferences in favor of the nonmoving party. *Green,* 420 F.3d at 1192.

### A. Title VII

■ In the Title VII context, this court applies the three-part burden-shifting framework established in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[1] *Plotke v. White,* 405 F.3d 1092, 1099 (10th Cir.2005). Under this framework, the plaintiff must first establish a prima facie case of prohibited employment action. *Id.* If the plaintiff does so, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for its adverse employment action." *Id.* (quotations omitted). If the employer satisfies this burden, "summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Id.* Because this court concludes transsexuals are not a protected class under Title VII and because Etsitty has failed to raise a genuine issue of material fact as to whether UTA's asserted non-discriminatory reason for her termination is pretextual, this court concludes the district court properly granted summary judgment on Etsitty's Title VII claims.

### 1. Prima Facie Claim

■ Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual ... because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). While Title VII is a remedial statute which should be liberally construed, *see Jackson v. Cont'l Cargo–Denver,* 183 F.3d 1186, 1189 (10th Cir.1999), it should not be treated as a "general civility code" and should be "directed only at discrimination because

---

**1.** Etsitty contends it is unnecessary for this court to engage in the *McDonnell Douglas* analysis because it is "undisputed" that UTA had a discriminatory motive. *See Heim v. Utah,* 8 F.3d 1541, 1546 (10th Cir.1993) (noting *McDonnell Douglas* burden-shifting analysis is inapplicable where there is direct evidence of discrimination). When viewed in context, however, the evidence directly supports only the conclusion that Etsitty was terminated because of UTA's concerns regarding her restroom usage, a motive which is not discriminatory for reasons further discussed below. Because Etsitty cannot establish an "existing policy which itself constitutes discrimination," her claim of unlawful discrimination rests on indirect evidence and the *McDonnell Douglas* analysis applies. *See Jones v. Denver Post Corp.,* 203 F.3d 748, 752 (10th Cir.2000) (quotation omitted).

of sex." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, the threshold question in this case is whether Etsitty's claim can properly be construed as a claim that she was terminated or discriminated against "because of sex." If it cannot, as UTA argues and the district court held, Etsitty has not presented an actionable legal claim under Title VII and summary judgment was properly granted. The question of whether, and to what extent, a transsexual may claim protection from discrimination under Title VII is a question this court has not previously addressed.

On appeal, Etsitty presents two separate legal theories in support of her contention that she was discriminated against because of sex in violation of Title VII. First, she argues discrimination based on an individual's identity as a transsexual is literally discrimination because of sex and that transsexuals are therefore a protected class under Title VII *as transsexuals.* Alternatively, she argues that even if Title VII does not prohibit discrimination on the basis of a person's transsexuality, she is nevertheless entitled to protection under Title VII because she was discriminated against for failing to conform to sex stereotypes. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 250, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (holding that Title VII protected a woman who failed to conform to social expectations concerning how a woman should look and behave, establishing that Title VII's reference to "sex" encompasses both the biological differences between men and women and gender discriminations, i.e., discrimination based on a failure to conform to stereotypical gender norms).

### a. Transsexuals as a Protected Class

Etsitty first argues she is protected under Title VII from discrimination based on her status as a transsexual. She argues

that because a person's identity as a transsexual is directly connected to the sex organs she possesses, discrimination on this basis must constitute discrimination because of sex.

Although this court has not previously considered whether transsexuals are a protected class under Title VII, other circuits to specifically address the issue have consistently held they are not. *See Ulane v. E. Airlines, Inc.,* 742 F.2d 1081, 1084 (7th Cir.1984); *Sommers v. Budget Mktg., Inc.,* 667 F.2d 748, 749–50 (8th Cir.1982); *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 662–63 (9th Cir.1977). In *Ulane,* the Seventh Circuit explained that the definition of sex should be given its "common and traditional interpretation" for purposes of interpreting Title VII. 742 F.2d at 1086. Based on this traditional definition, the court held the statute's prohibition on sex discrimination means only that it is "unlawful to discriminate against women because they are women and men because they are men." *Id.* at 1085. Because the plaintiff in *Ulane* could show only that she was discriminated against as a transsexual, rather than as a woman or a man, the court concluded Title VII could provide no protection. *Id.* at 1086–87.

■■■ This court agrees with *Ulane* and the vast majority of federal courts to have addressed this issue and concludes discrimination against a transsexual based on the person's status as a transsexual is not discrimination because of sex under Title VII. In reaching this conclusion, this court recognizes it is the plain language of the statute and not the primary intent of Congress that guides our interpretation of Title VII. *See Oncale,* 523 U.S. at 79, 118 S.Ct. 998 ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legisla-

tors by which we are governed."). Nevertheless, there is nothing in the record to support the conclusion that the plain meaning of "sex" encompasses anything more than male and female. In light of the traditional binary conception of sex, transsexuals may not claim protection under Title VII from discrimination based solely on their status as a transsexual. Rather, like all other employees, such protection extends to transsexual employees only if they are discriminated against because they are male or because they are female.

■ While Etsitty argues for a more expansive interpretation of sex that would include transsexuals as a protected class, she acknowledges that few courts have been willing to adopt such an interpretation. Even the Sixth Circuit, which extended protection to transsexuals under the *Price Waterhouse* theory discussed below, explained that an individual's status as a transsexual should be irrelevant to the availability of Title VII protection. *Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir.2004). Further, this court has explicitly declined to extend Title VII protections to discrimination based on a person's sexual orientation. *See Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir.2005). Although there is certainly a distinction between a class delineated by sexual orientation and a class delineated by sexual identity, *Medina* nevertheless demonstrates this court's reluctance to expand the traditional definition of sex in the Title VII context.

Scientific research may someday cause a shift in the plain meaning of the term "sex" so that it extends beyond the two starkly defined categories of male and female. *See Schroer v. Billington*, 424 F.Supp.2d 203, 212–13 & n. 5 (D.D.C.2006) (noting "complexities stem[ming] from real variations in how the different components of biological sexuality ... interact with each other, and in turn, with social psychological, and legal conceptions of gender"); *cf. Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir.1995) (stating that the possibility that sexual identity may be biological suggests reevaluating whether transsexuals are a protected class for purposes of the Equal Protection Clause). At this point in time and with the record and arguments before this court, however, we conclude discrimination against a transsexual because she is a transsexual is not "discrimination because of sex." Therefore, transsexuals are not a protected class under Title VII and Etsitty cannot satisfy her prima facie burden on the basis of her status as a transsexual.[2] *See Plotke*, 405 F.3d at 1099 (requiring plaintiff to show she belonged to a protected class as part of her prima facie showing).

### b. Price Waterhouse Theory

Etsitty next argues that even if transsexuals are not entitled to protection un-

---

2. This court is aware of the difficulties and marginalization transsexuals may be subject to in the workplace. The conclusion that transsexuals are not protected under Title VII *as transsexuals* should not be read to allow employers to deny transsexual employees the legal protection other employees enjoy merely by labeling them as transsexuals. *See Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004) ("Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender nonconformity."). If transsexuals are to receive legal protection apart from their status as male or female, however, such protection must come from Congress and not the courts. *See Ulane v. E. Airlines*, 742 F.2d 1081, 1087 (7th Cir. 1984) ("[I]f the term 'sex' as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress.").

der Title VII as transsexuals, she is nevertheless entitled to protection as a biological male who was discriminated against for failing to conform to social stereotypes about how a man should act and appear.[3] She argues that although courts have previously declined to extend Title VII protection to transsexuals based on a narrow interpretation of "sex," this approach has been supplanted by the more recent rationale of *Price Waterhouse.* Etsitty contends that after *Price Waterhouse,* an employer's discrimination against an employee based on the employee's failure to conform to stereotypical gender norms is discrimination "because of sex" and may provide a basis for an actionable Title VII claim.

In *Price Waterhouse,* the plaintiff was a woman who was denied partnership in an accounting firm at least in part because she was "macho," "somewhat masculine," and "overcompensated for being a woman." 490 U.S. at 235, 109 S.Ct. 1775 (quotations omitted). One partner advised her she could improve her chances for partnership if she would "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* (quotation omitted). In concluding the plaintiff had met her burden of establishing gender played a motivating part in the employment decision, a plurality of the court explained that "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* at 250, 109 S.Ct. 1775; *see also id.* at 272–73, 109 S.Ct. 1775 (O'Connor, J., concurring in the judgment) (shifting burden to employer where plaintiff established her failure to conform to stereotypes was a substantial factor in the

employment decision). The court stated that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group." *Id.* at 251, 109 S.Ct. 1775.

A number of courts have relied on *Price Waterhouse* to expressly recognize a Title VII cause of action for discrimination based on an employee's failure to conform to stereotypical gender norms. *See, e.g., Bibby v. Philadelphia Coca Cola Bottling Co.,* 260 F.3d 257, 262–64 (3d Cir.2001); *Nichols v. Azteca Rest. Enters.,* 256 F.3d 864, 874–75 (9th Cir.2001); *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 261 n. 4 (1st Cir.1999); *Doe by Doe v. City of Belleville,* 119 F.3d 563, 580–81 (7th Cir.1997), *vacated on other grounds,* 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998). In fact, the Sixth Circuit recently relied on *Price Waterhouse* to recognize a cause of action for a transsexual claiming protection under Title VII. *See Smith,* 378 F.3d at 572–75; *Barnes v. City of Cincinnati,* 401 F.3d 729, 737 (6th Cir. 2005). In so holding, the court explained that just as an employer who discriminates against women for not wearing dresses or makeup is engaging in sex discrimination under the rationale of *Price Waterhouse,* "employers who discriminate against men because they *do* wear dresses and makeup, or otherwise act femininely, are also engaging in sex discrimination, because the discrimination would not occur but for the victim's sex." *Smith,* 378 F.3d at 574; *cf. Rosa v. Park W. Bank & Trust Co.,* 214 F.3d 213, 215–16 (1st Cir.2000) (concluding a transsexual could state a claim for sex discrimination under Equal Credit Opportunity Act by analogizing to Title VII); *Schwenk v. Hartford,* 204 F.3d 1187, 1201–

---

**3.** Although Etsitty identifies herself as a woman, her *Price Waterhouse* claim is based solely on her status as a biological male. Etsitty does not claim protection under Title VII as a woman who fails to conform to social stereotypes about how a woman should act and appear.

02 (9th Cir.2000) (relying on Title VII case law to conclude that violence against a transsexual was violence because of gender under the Gender Motivated Violence Act).

This court need not decide whether discrimination based on an employee's failure to conform to sex stereotypes always constitutes discrimination "because of sex" and we need not decide whether such a claim may extend Title VII protection to transsexuals who act and appear as a member of the opposite sex. Instead, because we conclude Etsitty has not presented a genuine issue of material fact as to whether UTA's stated motivation for her termination is pretextual, we assume, without deciding, that such a claim is available and that Etsitty has satisfied her prima facie burden.

### 2. Legitimate Nondiscriminatory Reason

■ Assuming Etsitty has established a prima facie case under the *Price Waterhouse* theory of gender stereotyping, the burden then shifts to UTA to articulate a legitimate, nondiscriminatory reason for Etsitty's termination. *Plotke,* 405 F.3d at 1099. At this stage of the *McDonnell Douglas* framework, UTA does not "need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *EEOC v. Flasher Co.,* 986 F.2d 1312, 1316 (10th Cir.1992). Rather, UTA need only "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII." *Jones v. Denver Post Corp.,* 203 F.3d 748, 753 (10th Cir.2000) (quotation omitted).

■ UTA has explained its decision to discharge Etsitty was based solely on her intent to use women's public restrooms while wearing a UTA uniform, despite the fact she still had male genitalia. The rec-

ord also reveals UTA believed, and Etsitty has not demonstrated otherwise, that it was not possible to accommodate her bathroom usage because UTA drivers typically use public restrooms along their routes rather than restrooms at the UTA facility. UTA states it was concerned the use of women's public restrooms by a biological male could result in liability for UTA. This court agrees with the district court that such a motivation constitutes a legitimate, nondiscriminatory reason for Etsitty's termination under Title VII.

Etsitty argues UTA's concern regarding which restroom she would use cannot qualify as a facially non-discriminatory reason because the use of women's restrooms is an inherent part of Etsitty's status as a transsexual and, thus, an inherent part of her non-conforming gender behavior. Therefore, she argues, terminating her because she intended to use women's restrooms is essentially another way of stating that she was terminated for failing to conform to sex stereotypes.

■ Title VII's prohibition on sex discrimination, however, does not extend so far. It may be that use of the women's restroom is an inherent part of one's identity as a male-to-female transsexual and that a prohibition on such use discriminates on the basis of one's status as a transsexual. As discussed above, however, Etsitty may not claim protection under Title VII based upon her transsexuality *per se.* Rather, Etsitty's claim must rest entirely on the *Price Waterhouse* theory of protection as a man who fails to conform to sex stereotypes. However far *Price Waterhouse* reaches, this court cannot conclude it requires employers to allow biological males to use women's restrooms. Use of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes. *Cf. Nichols,* 256 F.3d at 875 n. 7 (explaining that not all

gender-based distinctions are actionable under Title VII and that "there is [no] violation of Title VII occasioned by reasonable regulations that require male and female employees to conform to different dress and grooming standards").

The critical issue under Title VII "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80, 118 S.Ct. 998 (quotation omitted). Because an employer's requirement that employees use restrooms matching their biological sex does not expose biological males to disadvantageous terms and does not discriminate against employees who fail to conform to gender stereotypes, UTA's proffered reason of concern over restroom usage is not discriminatory on the basis of sex. Thus, it is not "facially prohibited by Title VII" and may satisfy UTA's burden on the second part of the *McDonnell Douglas* framework.

### 3. Pretext

 Once UTA has advanced a legitimate, nondiscriminatory reason for Etsitty's termination, the burden shifts back to Etsitty to "show there is a genuine issue of material fact as to whether the proffered reason[ ][is] pretextual." *Plotke*, 405 F.3d at 1099. "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1218 (10th Cir.2003) (quotation omitted). Such a showing may be made by revealing "such weaknesses, implausibilities, inconsistencies, incoherence, or contradictions, in the employer's proffered legitimate reasons for its action that a reasonable factfinder could ... infer that the employer did not act for the asserted non-discriminatory reasons." *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th

Cir.2007) (quotation omitted). Although this court must resolve all doubts in Etsitty's favor, "[m]ere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999).

 In support of Etsitty's contention that she was terminated for failing to conform to gender stereotypes and not because of UTA's concern regarding her restroom usage, she relies primarily on the testimony of Shirley and Cardon. Specifically, she points to Shirley's deposition testimony in which she stated, "We both felt that there was an image issue out there for us, that we could have a problem with having someone who, even though his appearance may look female, he's still a male because he still had a penis." Additionally, Cardon testified, "We have expectations of operators and how they appear to the public.... [I]f we see something that is considered radical or could be interpreted by the public as being inappropriate, we talk to the operators about that and expect them to have a professional appearance." Etsitty argues these statements provide sufficient evidence to allow a rational jury to conclude she was terminated because she was a biological male who did not act and appear as UTA believed a man should.

If these statements stood alone, they may constitute sufficient evidence of pretext to preclude summary judgment. A complete review of the deposition testimony, however, indicates otherwise. Although the specific statements cited by Etsitty address Etsitty's appearance, they fall within the larger context of an explanation of UTA's concerns regarding Etsitty's restroom usage. Immediately after Shirley mentions Etsitty's appearance, she explains the problem with this appearance is that she may not be able to find a unisex

bathroom on the route and that liability may arise if Etsitty was using female restrooms. When Cardon was asked what he found unprofessional about Etsitty's appearance, he similarly responded with concerns about her restroom usage. Thus, the isolated and tangential comments about Etsitty's appearance are insufficient to alone permit an inference of pretext. Instead, the testimony of Shirley and Cardon, viewed in its entirety and in context, provides further support for UTA's assertion that Etsitty was terminated not because she failed to conform to stereotypes about how a man should act and appear, but because she was a biological male who intended to use women's public restrooms.

In addition to the statements made by Shirley and Cardon, Etsitty argues UTA's asserted reason for her termination must be pretextual because UTA had no reason to be concerned regarding her use of women's restrooms. In support of this claim, Etsitty makes the following arguments: (1) UTA could not be subject to liability, as a matter of law, for allowing a male-to-female transsexual employee to use women's restrooms; (2) UTA had received no complaints regarding Etsitty's restroom usage; (3) UTA made no attempt to investigate whether there were unisex restrooms available; and (4) because Etsitty looked and acted like a woman, no one would know she was not biologically female and therefore could not take offense to her use of women's restrooms.

None of the arguments raised by Etsitty is sufficient to raise a genuine issue as to whether UTA's asserted concern regarding her use of the women's restrooms is pretext. Although Etsitty states in her brief that there is no evidence she intended to use female restrooms, she admitted at oral argument that she was required to use female restrooms and that she informed Shirley of this at their meeting prior to her termination. Thus, UTA's

belief that Etsitty intended to use female restrooms was well-grounded. While Etsitty contends this fact should not have given rise to her termination, her argument is more akin to a challenge to UTA's business judgment than a challenge to its actual motivation. Nevertheless, "[t]he relevant inquiry is not whether [the defendant's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Exum v. United States Olympic Comm.*, 389 F.3d 1130, 1138 (10th Cir.2004) (quotation omitted) (alterations in original).

While this court may disagree with UTA that a male-to-female transsexual's intent to use women's restrooms should be grounds for termination before complaints have arisen, there is insufficient evidence to permit an inference that UTA did not actually terminate Etsitty for this reason. To the contrary, all of the evidence suggests UTA did in fact terminate Etsitty because of its concerns about her restroom usage. Both at the time of Etsitty's termination and in subsequent deposition testimony, Shirley consistently explained the termination decision in terms of her concerns regarding liability for UTA and the inability of UTA to accommodate Etsitty's restroom needs. Although Shirley and Cardon specifically asked Etsitty whether she possessed male genitalia, such an inquiry is not the "smoking gun" Etsitty suggests. Rather, the record is clear that this inquiry was only relevant to UTA's evaluation of whether Etsitty's restroom usage could become a problem.

UTA's legitimate explanation is not made implausible by any of the circumstantial evidence relied on by Etsitty in her brief. The fact UTA had not yet received complaints about Etsitty's restroom usage at the time of the termination does not mean UTA could not have been

concerned about such complaints arising in the future, especially where Etsitty had only recently begun using the women's restroom. Similarly, Etsitty has pointed to nothing in the record to indicate the feasibility of an investigation into the availability of unisex restrooms along each of UTA's routes or the likelihood complaints would arise. Therefore, in this case, Shirley's failure to conduct such an investigation has little, if any, bearing on the veracity of her stated concern.

Etsitty's reliance on *Cruzan v. Special School District # 1* to call into question UTA's asserted motivation is also misplaced. 294 F.3d 981 (8th Cir.2002). In *Cruzan*, the Eighth Circuit held that a male-to-female transsexual's use of the women's employee restroom does not create a hostile work environment for purposes of a Title VII sexual harassment claim. *Id.* at 984. Even if such a rule were to be adopted in this circuit and applied to actions arising outside the employment context, however, it would say nothing about whether UTA was nevertheless genuinely concerned about the possibility of liability and public complaints. The question of whether UTA was legally correct about the merits of such potential lawsuits is irrelevant. *See Exum,* 389 F.3d at 1137 ("To show pretext, the plaintiff must call into question the honesty or good faith of the [employer].")

Finally, Etsitty argues that because UTA typically resolves complaints about its employees' restroom usage simply by requiring the employees to stop using the restroom for which the complaint was received, Etsitty was treated differently than similarly situated employees. *See Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1232 (10th Cir.2000) (noting plaintiff may show pretext "by providing evidence that he was treated differently from other similarly-situated, nonprotected employees"). The prior complaints received by UTA, however, involved problems with the cleanliness of the restrooms and with UTA employees congregating around a hotel swimming pool. An employee's use of bathrooms designated for the opposite sex is sufficiently different from these prior problems as to make UTA's treatment of restroom complaints in the past of little significance to the question of pretext in the case at bar.

Thus, there is no evidence in the record of any "weaknesses, implausibilities, inconsistencies, incoherence, or contradictions" in UTA's asserted legitimate, nondiscriminatory reason for Etsitty's termination. *Jencks,* 479 F.3d at 1267 (quotation omitted). Etsitty has therefore failed to raise a genuine issue as to whether UTA's proffered reason is pretextual and the district court properly granted summary judgment on Etsitty's Title VII claim.

**B. Equal Protection**

With respect to Etsitty's Equal Protection claims brought pursuant to § 1983, she makes no arguments aside from her Title VII claim that she was discriminated against because of sex. Instead, she simply makes the conclusory statement that the elements of a disparate treatment claim are the same whether the claim is brought under § 1983 or Title VII. *See Maldonado v. City of Altus,* 433 F.3d 1294, 1307 (10th Cir.2006) ("In disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." (quotations and alterations omitted)), *overruled on other grounds, Burlington N. & Santa Fe Ry. Co. v. White,* — U.S. —, 126 S.Ct. 2405, 2414–15, 165 L.Ed.2d 345 (2006). Because Etsitty does not argue there was a violation of the Equal Protection Clause separate from her Title VII sex discrimination claim, her Equal Protection claim fails for

the same reasons discussed above. *Cf. Brown,* 63 F.3d at 971 (holding transsexual plaintiff was not a member of a protected class for purposes of the Equal Protection Clause).

## IV. Conclusion

For the foregoing reasons, this court **affirms** the district court's grant of summary judgment to the defendants.