[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-14833 ; 10-15015
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 6, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:08-cv-02360-RWS

VANDIVER ELIZABETH GLENN,
f.k.a. Glenn Morrison,

                    Plaintiff - Appellee,

versus

SEWELL R. BRUMBY,

                    Defendant - Appellant.
                    _____

Appeals from the United States District Court
for the Northern District of Georgia
_____
(December 6, 2011)

Before BARKETT, PRYOR and KRAVITCH, Circuit Judges.

BARKETT, Circuit Judge:

    Sewell R. Brumby appeals from an adverse summary judgment in favor of

Vandiver Elizabeth Glenn on her complaint seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for alleged violations of her rights under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. Glenn claimed that Brumby fired her from her job as an editor in the Georgia General Assembly's Office of Legislative Counsel ("OLC") because of sex discrimination, thus violating the Equal Protection Clause. The district court granted summary judgment in Glenn's favor on this claim.

Glenn also claimed that her constitutional rights were violated because Brumby terminated her employment due to her medical condition, known as Gender Identity Disorder ("GID"). The district court ruled against Glenn on this claim, granting summary judgment to Brumby. Brumby appeals the district court's sex-discrimination ruling, and Glenn cross-appeals the ruling on her medical condition claim.

Vandiver Elizabeth Glenn was born a biological male. Since puberty, Glenn has felt that she is a woman, and in 2005, she was diagnosed with GID, a diagnosis listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.[1]

---

[1] Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 576 (4th ed. 2000).

Starting in 2005, Glenn began to take steps to transition from male to female under the supervision of health care providers. This process included living as a woman outside of the workplace, which is a prerequisite to sex reassignment surgery. In October 2005, then known as Glenn Morrison and presenting as a man, Glenn was hired as an editor by the Georgia General Assembly's OLC. Sewell Brumby is the head of the OLC and is responsible for OLC personnel decisions, including the decision to fire Glenn.

In 2006, Glenn informed her direct supervisor, Beth Yinger, that she was a transsexual and was in the process of becoming a woman. On Halloween in 2006, when OLC employees were permitted to come to work wearing costumes, Glenn came to work presenting as a woman. When Brumby saw her, he told her that her appearance was not appropriate and asked her to leave the office. Brumby deemed her appearance inappropriate "[b]ecause he was a man dressed as a woman and made up as a woman." Brumby stated that "it's unsettling to think of someone dressed in women's clothing with male sexual organs inside that clothing," and that a male in women's clothing is "unnatural." Following this incident, Brumby met with Yinger to discuss Glenn's appearance on Halloween of 2006 and was informed by Yinger that Glenn intended to undergo a gender transition.

In the fall of 2007, Glenn informed Yinger that she was ready to proceed with gender transition and would begin coming to work as a woman and was also changing her legal name.  Yinger notified Brumby, who subsequently terminated Glenn because "Glenn's intended gender transition was inappropriate, that it would be disruptive, that some people would view it as a moral issue, and that it would make Glenn's coworkers uncomfortable."

Glenn sued, alleging two claims of discrimination under the Equal Protection Clause.  First, Glenn alleged that Brumby "discriminat[ed] against her because of her sex, including her female gender identity and her failure to conform to the sex stereotypes associated with the sex Defendant[] perceived her to be." Second, Glenn alleged that Brumby "discriminat[ed] against her because of her medical condition, GID[,]" because "[r]eceiving necessary treatment for a medical condition is an integral component of living with such a condition, and blocking that treatment is a form of discrimination based on the underlying medical condition."

Glenn and Brumby filed cross-motions for summary judgment.  The District Court granted summary judgment to Glenn on her sex discrimination claim, and granted summary judgment to Brumby on Glenn's medical discrimination claim.

Both sides timely appealed to this Court. We first address Glenn's sex discrimination claim.

## I.    Equal Protection and Sex Stereotyping

In any § 1983 action, a court must determine "whether the plaintiff has been deprived of a right 'secured by the Constitution and laws'" of the United States.[2] Baker v. McCollan, 443 U.S. 137, 140 (1979) (quoting 42 U.S.C. § 1983). Here, the question is whether Glenn's termination violated the Equal Protection Clause of the Fourteenth Amendment.[3]

The Equal Protection Clause requires the State to treat all persons similarly situated alike or, conversely, to avoid all classifications that are "arbitrary or irrational" and those that reflect "a bare . . . desire to harm a politically unpopular group." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 446-47 (1985) (internal quotation marks omitted). States are presumed to act lawfully,

---

[2] 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2006).

[3] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

and therefore state action is generally upheld if it is rationally related to a

legitimate governmental purpose. Id. at 440. However, more than a rational basis

is required in certain circumstances. In describing generally the contours of the

Equal Protection Clause, the Supreme Court noted its application to this issue,

referencing both gender and sex, using the terms interchangeably:

> Legislative classifications based on gender also call for a heightened
> standard of review. That factor generally provides no sensible ground for
> differential treatment. [W]hat differentiates sex from such nonsuspect
> statuses as intelligence or physical disability . . . is that the sex characteristic
> frequently bears no relation to ability to perform or contribute to society.
> Rather than resting on meaningful considerations, statutes distributing
> benefits and burdens between the sexes in different ways very likely reflect
> outmoded notions of the relative capabilities of men and women. A gender
> classification fails unless it is substantially related to a sufficiently
> important governmental interest.

Id. at 440-41 (internal quotation marks and citations omitted, brackets in original).

In United States v. Virginia, the Supreme Court reaffirmed its prior holdings that

sex-based discrimination is subject to intermediate scrutiny[4] under the Equal

Protection Clause. 518 U.S. 515, 555 (1996) (internal quotation marks omitted).

---

[4] The Court has established two standards of review of legislative classifications under the Equal Protection Clause – rational basis scrutiny and heightened scrutiny. See Clark v. Jeter, 486 U.S. 456, 461 (1988). Rational basis scrutiny sets the minimum requirement that all classifications must be "rationally related to a legitimate governmental purpose." Id. Heightened scrutiny is comprised of intermediate scrutiny and strict scrutiny. Id. Intermediate scrutiny applies to classifications based on sex or illegitimacy and requires that government action be "substantially related to an important governmental objective." Id. Strict scrutiny is the most exacting form of review and it applies to classifications pertaining to race or national origin and to those affecting certain fundamental rights. Id.

This standard requires the government to show that its "gender classification . . . is substantially related to a sufficiently important government interest." Cleburne, 473 U.S. at 441. Moreover, this test requires a "genuine" justification, not one that is "hypothesized or invented post hoc in response to litigation." Virginia, 518 U.S. at 533. In Virginia, the state's policy of excluding women from the Virginia Military Institute failed this test because the state could not rely on generalizations about different aptitudes of males and females to support the exclusion of women. Id. at 542. "State actors controlling gates to opportunity, we have instructed, may not exclude qualified individuals based on 'fixed notions concerning the roles and abilities of males and females.'" Id. at 541 (quoting Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 725 (1982)).

The question here is whether discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause. For the reasons discussed below, we hold that it does.

In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), the Supreme Court held that discrimination on the basis of gender stereotype is sex-based discrimination. In that case, the Court considered allegations that a senior manager at Price Waterhouse was denied partnership in the firm because she was considered "macho," and "overcompensated for being a woman." Id. at 235. Six

7

members of the Supreme Court agreed that such comments were indicative of gender discrimination and held that Title VII barred not just discrimination because of biological sex, but also gender stereotyping–failing to act and appear according to expectations defined by gender.  Id. at 250-51 (plurality opinion); id. at 258-61 (White, J., concurring); id. at 272-73 (O'Connor, J., concurring).  The Court noted that "[a]s for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotypes associated with their group . . . ."  Id. at 251.

A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes.  "[T]he very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior."  Ilona M. Turner, Sex Stereotyping Per Se: Transgender Employees and Title VII, 95 Cal. L. Rev. 561, 563 (2007); see also Taylor Flinn, Transforming the Debate: Why We Need to Include Transgender Rights in the Struggles for Sex and Sexual Orientation Equality, 101 Colum. L. Rev. 392, 392 (2001) (defining transgender persons as those whose "appearance, behavior, or other personal characteristics differ from traditional gender norms").  There is thus a congruence between discriminating against transgender and

transsexual individuals and discrimination on the basis of gender-based behavioral norms.

Accordingly, discrimination against a transgender individual because of her gender non-conformity is sex discrimination, whether it's described as being on the basis of sex or gender. Indeed, several circuits have so held. For example, in Schwenk v. Hartford, the Ninth Circuit concluded that a male-to-female transgender plaintiff who was singled out for harassment because he presented and defined himself as a woman had stated an actionable claim for sex discrimination under the Gender Motivated Violence Act because "the perpetrator's actions stem from the fact that he believed that the victim was a man who 'failed to act like one.'" 204 F.3d 1187, 1198-1203 (9th Cir. 2000). The First Circuit echoed this reasoning in Rosa v. Park West Bank & Trust Co., where it held that a transgender plaintiff stated a claim by alleging that he "did not receive [a] loan application because he was a man, whereas a similarly situated woman would have received [a] loan application. That is, the Bank . . .treat[s] . . . a woman who dresses like a man differently than a man who dresses like a woman." 214 F.3d 213, 215-16 (1st Cir. 2000). These instances of discrimination against plaintiffs because they fail to act according to socially prescribed gender roles constitute discrimination under Title VII according to the rationale of Price Waterhouse.

The Sixth Circuit likewise recognized that discrimination against a transgender individual because of his or her gender non-conformity is gender stereotyping prohibited by Title VII and the Equal Protection Clause. See Smith v. City of Salem, 378 F.3d 566 (6th Cir. 2004). The court concluded that a transsexual firefighter could not be suspended because of "his transsexualism and its manifestations," id. at 569, because to do so was discrimination against him "based on his failure to conform to sex stereotypes by expressing less masculine, and more feminine mannerisms and appearance." Id. at 572; see Barnes v. City of Cincinnati, 401 F.3d 729 (6th Cir. 2005) (holding that transsexual plaintiff stated a claim for sex discrimination "by alleging discrimination . . . for his failure to conform to sex stereotypes").

District courts have recognized as well that sex discrimination includes discrimination against transgender persons because of their failure to comply with stereotypical gender norms. See Lopez v. River Oaks Imaging & Diagnostic Group, Inc., 542 F. Supp. 2d 653, 659-661 (S.D. Tex. 2008) ("Title VII and Price Waterhouse . . . do not make any distinction between a transgendered litigant who fails to conform to traditional gender stereotypes and [a] 'macho' female who . . . is perceived by others to be in non-conformity with traditional gender stereotypes."); Schroer v. Billington, 424 F. Supp. 2d 203, 211 (D.D.C. 2006) ("[I]t may be time to revisit [the] conclusion . . . that discrimination against

transsexuals <u>because they are transsexuals</u> is literally discrimination because of sex.") (internal quotation marks and ellipsis omitted); <u>Mitchell v. Axcan Scandipharm</u>, 2006 U.S. Dist. LEXIS 6521 (W.D. Pa. Feb. 21, 2006) (holding that a transgender plaintiff may state a claim for sex discrimination by "showing that his failure to conform to sex stereotypes of how a man should look and behave was the catalyst behind defendant's actions"); <u>Kastl v. Maricopa Cnty. Comm. College Dist.</u>, 2004 U.S. Dist. LEXIS 29825, at *8-9 (D. Ariz. June 3, 2004), <u>aff'd</u> 325 Fed. Appx. 492 (9th Cir. 2009) ("[N]either a woman with male genitalia nor a man with stereotypically female anatomy, such as breasts, may be deprived of a benefit or privilege of employment by reason of that nonconforming trait."); <u>Tronetti v. Healthnet Lakeshore Hosp.</u>, 2003 U.S. Dist. LEXIS 23757 (W.D.N.Y. Sept. 26, 2003) (holding transsexual plaintiff may state a claim under Title VII "based on the alleged discrimination for failing to 'act like a man'").[5]

---

[5] Prior to the Supreme Court's decision in <u>Price Waterhouse</u>, several courts concluded that Title VII afforded no protection to transgender victims of sex discrimination. <u>See, e.g.</u>, <u>Ulane v. E. Airlines, Inc.</u>, 742 F.2d 1081, 1087 (7th Cir. 1984) (concluding that discrimination against plaintiff was "not because she is female, but because she is transsexual"); <u>Sommers v. Budget Mktg., Inc.</u>, 667 F.2d 748, 750 (8th Cir. 1982) (rejecting transgender plaintiff's claim as falling outside "the traditional definition" of sex under Title VII); <u>Holloway v. Arthur Anderson & Co.</u>, 566 F.2d 659, 663 (9th Cir. 1977) ("Congress has not shown any intent other than to restrict the term 'sex' to its traditional meaning."); <u>Voyles v. Ralph K. Davies Med. Ctr.</u>, 403 F. Supp. 456, 457 (N.D. Cal. 1975) (holding that Title VII was not intended to "embrace 'transsexual' discrimination"). However, since the decision in <u>Price Waterhouse</u>, federal courts have recognized with near-total uniformity that "the approach in <u>Holloway</u>, <u>Sommers</u>, and <u>Ulane</u> . . . has been eviscerated" by <u>Price Waterhouse</u>'s holding that "Title VII's reference to 'sex' encompasses both the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender

11

All persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype. For example, courts have held that plaintiffs cannot be discriminated against for wearing jewelry that was considered too effeminate,[6] carrying a serving tray too gracefully,[7] or taking too active a role in

norms." Smith, 378 F.3d at 573; see also Schwenk, 204 F.3d at 1201 ("The initial judicial approach taken in cases such as Holloway has been overruled by the logic and language of Price Waterhouse."); Rosa, 214 F.3d at 215-16 (affirming that transgender plaintiffs may claim sex discrimination based on their non-conformity with gender stereotype); see generally Demoya R. Gordon, Transgender Legal Advocacy: What do Feminist Legal Theories Have to Offer?, 97 Calif. L. Rev. 1719, 1719 pt. I (2009) (reviewing history of transgender discrimination in Title VII cases). But see Creed v. Family Express Corp., No. 3:06-CV-465, 2009 U.S. Dist. LEXIS 237, at * 21-27 (N.D. In. Jan. 5, 2009) (permitting employer to fire transgender employee based on his failure to conform to dress code and grooming policy); Etsitty v. Utah Trans. Auth., No. 2:04-CV-616, 2005 U.S. Dist. LEXIS 12634, at * 11-14 (D. Utah June 24, 2005), aff'd 502 F.3d 1215 (10th Cir. 2007) (concluding that Price Waterhouse is inapplicable to transsexuals); Oiler v. Winn-Dixie La., Inc., 2002 U.S. Dist. LEXIS 17417, at * 29 (E.D. La. Sept. 16, 2002) (distinguishing Price Waterhouse on the basis that "[t]he plaintiff in that case may not have behaved as the partners thought a woman should have, but she never pretended to be a man . . ."). The pre-Price Waterhouse cases' reliance on the presumed intent of Title VII's drafters is also inconsistent with Oncale v. Sundowner Offshore Services, Inc., where the Supreme Court held that original legislative intent must not be given controlling weight in interpreting Title VII. See 523 U.S. 75, 79-80 (1998) ("[S]tatutory prohibitions [such as Title VII] often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

[6] In Doe v. City of Belleville, the Seventh Circuit held that a young man who was taunted by co-workers for wearing an earring and who was repeatedly asked whether he was "a boy or a girl" clearly stated a Title VII sexual harassment claim by alleging that "the way in which he projected the sexual aspect of his personality (and by that we mean his gender) did not conform to his coworkers' view of appropriate masculine behavior." Doe v. City of Belleville, 119 F.3d 563, 580 (7th Cir. 1997), vacated on other grounds by 523 U.S. 1001 (1998).

[7] In Nichols v. Azteca Restaurant Enterprises, the Ninth Circuit held that a waiter who was harassed by his co-workers for carrying a serving tray "like a woman" stated a claim for sexual harassment under Title VII because his antagonists were animated by his gender-nonconforming behavior. 256 F.3d 864, 874 (9th Cir. 2001).

12

child-rearing.[8]  An individual cannot be punished because of his or her perceived

gender non-conformity.  Because these protections are afforded to everyone, they

cannot be denied to a transgender individual.  The nature of the discrimination is

the same; it may differ in degree but not in kind, and discrimination on this basis is

a form of sex-based discrimination that is subject to heightened scrutiny under the

Equal Protection Clause.  Ever since the Supreme Court began to apply heightened

scrutiny to sex-based classifications, its consistent purpose has been to eliminate

discrimination on the basis of gender stereotypes.

In Frontiero v. Richardson, the Court struck down legislation requiring only

female service members to prove that their spouses depended upon them

financially in order to receive certain benefits for married couples.  See 411 U.S.

677, 691 (1973) (plurality opinion).  The plurality applied heightened scrutiny to

sex-based classifications by referring to the pervasiveness of gender stereotypes,

see id. at 683-86 (noting a tradition of "'romantic paternalism'" that "put women[]

not on a pedestal, but in a cage"), and held that gender-based classifications are

---

[8] In Knussman v. Maryland, the Fourth Circuit upheld liability under the Equal Protection Clause against an employer who prohibited an employee, the father of a newborn, from taking statutory leave as a "primary care giver" under the Family Medical Leave Act.  272 F.3d 625, 642-43 (4th Cir. 2001). The employer's rationale was that a father cannot act as primary caregiver because "God made women to have babies and, unless [the employee] could have a baby, there is no way he could be primary care giver."  Id. at 629-30 (internal quotation marks and brackets omitted).  The court held that the employer's "irrebuttable presumption" that a father cannot act as the primary caregiver was incompatible with precedent prohibiting an individual's role in parenting to be limited based solely on gender.  See id. at 635-37.

"inherently suspect," id. at 688, because they are often animated by "stereotyped distinctions between the sexes," id. at 685. Two years later, the Court applied this heightened level of scrutiny to a Utah statute setting a lower age of majority for women and concluded that the statute could not be sustained by the stereotypical assumption that women tend to marry earlier than men. See Stanton v. Stanton, 421 U.S. 7, 14 (1975). The Court again rejected gender stereotypes, holding that "'old notions'" about men and women's behavior provided no support for the State's classification. Id. at 14. That same year, the Court confronted a provision of the Social Security Act that allowed certain benefits to widows while denying them to widowers. See Weinberger v Wiesenfeld, 420 U.S. 636, 637 (1975). The Court again used heightened scrutiny to strike at gender stereotype, concluding that "the Constitution also forbids gender-based differentiation" premised on the stereotypical assumption that a husband's income is always more important to the wife than is the wife's to the husband. Id. at 645.

In each of these foundational cases, the Court concluded that discriminatory state action could not stand on the basis of gender stereotypes. See also Craig v. Boren, 429 U.S. 190, 199 (1976) (explaining that "the weak congruence between gender and the characteristic or trait that gender purported to represent" necessitated applying heightened scrutiny); Orr v. Orr, 440 U.S. 268, 282 (1977)

("Legislative classifications which distribute benefits and burdens on the basis of gender carry the risk of reinforcing stereotypes about the 'proper place' of women . . . ."). The Court's more recent cases reiterate that the Equal Protection Clause does not tolerate gender stereotypes. See Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 726 (1982) (explaining that "the purpose" of heightened scrutiny is to ensure that sex-based classifications rest upon "reasoned analysis rather than . . . traditional, often inaccurate, assumptions about the proper roles of men and women"); see also Virginia, 518 U.S. at 533 ("[The government] must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females."); cf. Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 735 (2003) (holding that Congress may enact remedial measures under Section Five of the Fourteenth Amendment to counteract sex-based stereotypes).[9] Accordingly, governmental acts based upon gender stereotypes–which presume that men and women's appearance and behavior will be determined by their sex–must be subjected to heightened scrutiny because they embody "the very

---

[9] The Court's reasoning has indicated that governmental reliance on gender-based stereotypes is dispositive in its equal protection analysis even in cases that uphold the government's challenged action under heightened scrutiny. In Nguyen v. INS, the Court concluded that an immigration statute burdening unwed fathers and mothers unequally survived intermediate scrutiny because the statute did not rely on gender stereotype. 533 U.S. 53, 68 (2001). The dissent disagreed, concluding that the statute was fatally flawed because it relied on stereotypes about the relative parenting abilities of fathers and mothers. See 533 U.S. 74, 88-91 (O'Connor, J., dissenting). Thus, both majority and dissent viewed the statute's reliance on gender-based stereotypes as determinative of its validity.

stereotype the law condemns." J.E.B. v. Alabama, 511 U.S. 127, 138 (1994) (internal quotation marks omitted) (declaring unconstitutional a government attorney's use of peremptory juror strikes based on the presumption that potential jurors' views would correspond to their sexes).

We conclude that a government agent violates the Equal Protection Clause's prohibition of sex-based discrimination when he or she fires a transgender or transsexual employee because of his or her gender non-conformity.

## II. Glenn's Termination

We now turn to whether Glenn was fired on the basis of gender stereotyping. The first inquiry is whether Brumby acted on the basis of Glenn's gender non-conformity. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977) (requiring proof of discriminatory intent). If so, we must then apply heightened scrutiny to decide whether that action was substantially related to a sufficiently important governmental interest. See Virginia, 518 U.S. at 533 (stating test for intermediate scrutiny).

A plaintiff can show discriminatory intent through direct or circumstantial evidence. See Wright v. Southland Corp., 187 F.3d 1287, 1293 (11th Cir. 1999) (outlining methods of proof). In this case, Brumby testified at his deposition that he fired Glenn because he considered it "inappropriate" for her to appear at work

16

dressed as a woman and that he found it "unsettling" and "unnatural" that Glenn would appear wearing women's clothing. Brumby testified that his decision to dismiss Glenn was based on his perception of Glenn as "a man dressed as a woman and made up as a woman," and Brumby admitted that his decision to fire Glenn was based on "the sheer fact of the transition." Brumby's testimony provides ample direct evidence to support the district court's conclusion that Brumby acted on the basis of Glenn's gender non-conformity.

If this were a Title VII case, the analysis would end here. See Lewis v. Smith, 731 F.2d 1535, 1537-38 (11th Cir. 1984) ("If the evidence consists of direct testimony that the defendant acted with a discriminatory motive, and the trier of fact accepts this testimony, the ultimate issue of discrimination is proved."). However, because Glenn's claim is based on the Equal Protection Clause, we must, under heightened scrutiny, consider whether Brumby succeeded in showing an "exceedingly persuasive justification," Virginia, 518 U.S. at 546 (internal quotation marks omitted), that is, that there was a "sufficiently important governmental interest" for his discriminatory conduct, Cleburne, 473 U.S. at 441. This burden "is demanding and it rests entirely on the State." Virginia, 518 U.S. at 533. The defendant's burden cannot be met by relying on a justification that is "hypothesized or invented post hoc in response to litigation." Id.

17

On appeal, Brumby advances only one putative justification for Glenn's firing: his purported concern that other women might object to Glenn's restroom use. However, Brumby presented insufficient evidence to show that he was actually motivated by concern over litigation regarding Glenn's restroom use. To support the justification that he now argues, Brumby points to a single statement in his deposition where he referred to a speculative concern about lawsuits arising if Glenn used the women's restroom. The district court recognized that this single reference, based on speculation, was overwhelmingly contradicted by specific evidence of Brumby's intent, and we agree. Indeed, Brumby testified that he viewed the possibility of a lawsuit by a co-worker if Glenn were retained as unlikely and the record indicates that the OLC, where Glenn worked, had only single-occupancy restrooms. Brumby advanced this argument before the district court only as a *conceivable* explanation for his decision to fire Glenn under rational basis review. See Glenn v. Brumby, 724 F. Supp. 2d 1284, 1302 (N.D. Ga. 2010) ("Defendant based his entire defense on the argument that Plaintiff was not a member of a protected class and therefore his actions must only survive the rational relationship test."). The fact that such a hypothetical justification may have been sufficient to withstand rational-basis scrutiny, however, is wholly irrelevant to the heightened scrutiny analysis that is required here.

Brumby has advanced no other reason that could qualify as a governmental purpose, much less an "important" governmental purpose, and even less than that, a "sufficiently important governmental purpose" that was achieved by firing Glenn because of her gender non-conformity. Cleburne, 473 U.S. at 441.

We therefore **AFFIRM** the judgment of the district court granting summary judgment in favor of Glenn on her sex-discrimination claim. In light of this decision, which provides Glenn with all the relief that she seeks, there is no need to address Glenn's cross-appeal.

**AFFIRMED**