**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STACEY POTTER,

      Plaintiff - Appellant,

v.

SYNERLINK CORPORATION, f/k/a
Preferred Reps, Inc.; PREFERRED SALES
AGENCY, LTD.,

      Defendants – Appellees.

Nos. 11-5092 & 12-5117
(D.C. No. 4:08-CV-00674-GKF-TLW)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

Stacey Potter, a top sales producer for her employer, Preferred Sales Agency, Ltd.

("PSA"), a part of Synerlink Corporation ("Synerlink"),[1] was fired for not being a team

player. She sued Synerlink in federal court, alleging (1) sex discrimination in violation of

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

[1] Synerlink did business as several companies. Salespeople known as Territory
Managers worked under Synerlink's subsidiary, PSA. For convenience, we refer to Ms.
Potter's employer as Synerlink.

Title VII, (2) the state law tort of discriminatory and wrongful discharge (*Burk* claim), and (3) a state law claim for failure to pay commissions and vacation pay after her termination.

The district court granted summary judgment to Synerlink on the federal and state discrimination claims because it concluded Ms. Potter failed to show Synerlink's stated reason for termination was pretextual. The district court granted summary judgment to Ms. Potter on her vacation pay claim and sent her commissions claim to trial. A jury found for Ms. Potter on her commission claims, but found Synerlink was not obligated to pay liquidated damages because there was a bona fide dispute over the commissions owed. The district court granted Ms. Potter's motion for attorney fees and costs but offset and reduced the award based on Synerlink's pretrial offer of judgment. Ms. Potter appeals, challenging the grant of summary judgment on her discrimination claims, the submission of liquidated damages to the jury, and the court's determination of the date her prejudgment damages accrued (Appeal No. 11-5092). In a separate appeal, Ms. Potter disputes the district court's offset of attorney fees (Appeal No. 12-5117). Exercising jurisdiction over both appeals pursuant to 28 U.S.C. § 1291, we affirm in part and reverse in part.

## I. BACKGROUND

### A. *Factual History*

Because Ms. Potter challenges the district court's grant of summary judgment on her Title VII claim, we relate the facts in the light most favorable to her, the non-moving party. *See Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1189 (10th Cir. 2010).

Manufacturers retain Synerlink to sell their electrical products to business customers in the electrical utility market. Synerlink employs approximately 20 salespeople, known as Territory Managers ("TMs"), who work outside the office and are responsible for sales to a particular list of accounts in a geographic area of the country. The TMs mainly sell the manufacturers' new equipment but arrange for other Synerlink companies to buy and resell equipment ("buy/resell companies").

Steve Roberson is Synerlink's Chief Executive Officer. In early 2003, Jim Tarpley, formerly a Regional Vice President/TM, was promoted to President of Synerlink. Because his new position required increased management responsibilities, he and Regional Vice President, Earl Reynolds, interviewed candidates for a new TM to take over Mr. Tarpley's Oklahoma accounts. Up to that point, all Synerlink TMs were male.[2] In January 2004, Mr. Tarpley hired Ms. Potter for the vacant position over three or four male candidates.

Although Mr. Tarpley had been servicing the Oklahoma accounts from Texas, Synerlink required Ms. Potter to move to Tulsa, Oklahoma. She took over a significant portion of Synerlink's Oklahoma and Texas panhandle accounts. Synerlink provided her with substantial training, including numerous trips to learn about various products and aspects of the business. Mr. Reynolds directly supervised Ms. Potter, but she also worked closely with Mr. Tarpley because she inherited his accounts.

---

[2] In contrast, all but one of the in-office Customer Service Representatives were female.

Ms. Potter soon became one of Synerlink's top salespeople. She received raises and bonuses each year of her employment. Mr. Tarpley and Mr. Roberson wrote e-mails congratulating her on her work and accomplishments. In June 2006, Mr. Roberson sent an e-mail to the other TMs praising her work, saying:

> "When we hired [Ms. Potter], she told Jim Tarpley that as a woman, she knew she would have to [be] better than a man to be accepted, or even to be treated civilly by the 'good ol' boys[] that make up our customer base. She has met all our expectations and is just getting started good. She balances effort with intelligence and unselfishness, and is the ultimate 'Team Player.'"

Appx., Vol. II at 536.[3] Some of her co-workers testified they worked well with her, and her customers praised her work.

In November 2006, Synerlink decided to create a new territory in northern Texas. Mr. Tarpley and Mr. Reynolds offered Ms. Potter the new territory because she had mentioned she would like to return to Texas and she could operate sales in the new territory from the Dallas area. They told her she did not have to accept the change. According to Ms. Potter, they promised that if she decided not to take the offer, she could keep her territory "as is." *Id.* at 650. On December 4, 2006, Ms. Potter decided to stay in Oklahoma with her then-current accounts.

Synerlink hired Gary Dutton as the TM for the new territory. As was Synerlink's practice, it transferred some accounts from other TMs' territory to provide Mr. Dutton with a sufficient customer base. Mr. Tarpley and Mr. Reynolds asked Ms. Potter if she

---

[3] Record citations referenced in this opinion are for Case No. 11-5092 unless otherwise indicated.

would be willing to give a few of her smaller accounts on the Oklahoma border to Mr.

Dutton.  On December 18, 2006, she declined, saying in part:

> When you said I could keep things "as is" in my territory . . . that's what I planned on so that's how I'm going to elect to move forward here. . . .  Earl, you said that you have Gary covered with what you and Clint have given him . . . .  Jim said I shouldn't give up anything I don't want to.  Right now, I don't want to give up anything.  It is too early to know what 2007 is going to look like for me . . . .  To be frank, I am not sure I will feel good about giving anything else up in Oklahoma until something happens with [another Oklahoma customer]. . . .  As I said, I like Gary—I want him to do well. If he finds he does not have enough to do with what he's been assigned, let's look at it again in a few months . . . .[4]

*Id.*

At the annual awards banquet in December 2006, Ms. Potter "swept" the awards.

Suppl. Appx., Vol. I at 91.  She received plaques and trophies, including the coveted

"Mrs. Gross Profit" award (formerly known only as the "Mr. Gross Profit" award).  *Id.* at

87.  At TM meetings held around this time, Mr. Tarpley and Mr. Reynolds separately

stated in front of a group of people, "Stacy is an aggressive salesperson, she's done a

great job.  In fact she's so aggressive, it sometimes scares the hell out of us."  *Id.* at 64

(Ms. Potter paraphrased their comments in her deposition).  Although Ms. Potter felt the

company supported her efforts when she swept the 2006 awards, she said she felt she

"had kind of outshined some people and they were, maybe, had their egos hurt over it.

---

[4] Ms. Potter's e-mails refer to an Oklahoma customer she was apparently required to split with another TM.  Her e-mails express her dissatisfaction with that arrangement, and several times she used the full restoration of that customer to her accounts as a bargaining chip for giving up other accounts.

You know, kind of a girl beating everybody out." *Id.* at 60.

In April 2007, just four months after its creation, Mr. Dutton's territory lost a manufacturer—a loss Synerlink had anticipated for some time. Mr. Reynolds again asked Ms. Potter to look at her accounts to see if she could give some to Mr. Dutton. Ms. Potter e-mailed her response, expressing displeasure at the request:

> I hope you will reconsider taking some of my territory away from me.
>
> Here is how I see this: I work hard to make this territory a strong and profitable one for the company, for our manufacturers, and for myself. Repeatedly, you have gotten good feedback from our manufacturers, customers and distributors. My numbers have been very good, and growing.
>
> Now, I can look forward to being rewarded for my efforts by being penalized with a potential territory reduction and commission cut because a new salesman was hired prematurely? Due to line changes that you guys admit you saw coming for a year, now he is unable to support himself in his own territory. It was questionable whether N. Texas would support a new person from the onset, now it is obvious it can't. The weak outlook for that territory is why I did not want it myself when it was offered. When you guys talked to me about that territory—I specifically asked how it could possibly support a new person and Jim told me that some people don't have the high income requirements that I may have.
>
> I like Gary. I'm glad he's here. I hope he gets to stay. That said, I am not in favor of handing over pieces of my territory just because the decision to hire him may have been a gamble.
>
> If an exchange for the balance of [another Oklahoma customer] is on the table, I would be more open to this type of discussion.

Suppl. Appx., Vol. I at 121.

During this period, Synerlink changed company policy so that the buy/resell company representatives would work directly with the clients without TM oversight. Although Synerlink's TMs for the account would be consulted in special situations, "quotes, invoices, and correspondence . . . need[] to be done directly between our Buy-resell personnel and the customer." Suppl. Appx., Vol. I at 130. Ms. Potter discussed this change with Mr. Tarpley and voiced her concerns in an e-mail on June 7, 2007. In it, she said she wanted to work personally on and see every quote going to one of her accounts and "have oversight for setting the selling price on 100% of [the customer's] activity." Supp. Appx., Vol. I at 129. She then discussed an altercation she had with one of the buy/resell representatives earlier that day and concluded: "If [the buy/resell representatives] are not going to support us salespeople and work <u>with</u> us, how can we possibly work together?" *Id.* at 130.[5]

The next morning, Ms. Potter sent Mr. Tarpley another e-mail:

> [The buy/sell representative] forwarded the order, but whited-out the prices. Did you or did you not tell him that I would be responsible for setting margins and selling prices for [this customer]? You said you told him, so why would he do this? Is he deaf or just stupid?

*Id.* at 125.

---

[5] Ms. Potter testified that, sometime in April or May, Mr. Roberson forwarded to her an e-mail Mr. Tarpley had written that said, "Stacey is territorial in some good and some bad ways." Appx., Vol. II at 545. Ms. Potter said she called Mr. Tarpley and asked him about it. Mr. Tarpley responded, "Well, Stacey, I guess I'm just disappointed when you don't . . . trust our plans for the future. . . . I understand, because I didn't trust [Mr. Roberson]'s plan for me [at one point]. But I learned along the way that [Mr. Roberson] had what was best in mind for me and the company." *Id*.

Mr. Tarpley responded to Ms. Potter's concerns in a phone conversation and, later that day, in an e-mail:

> **[W]hen I tell you something, as I did the sales force in the conference call you can "take it to the bank"**. Preferred Sales TMs have [buy/resell company] sales responsibility for utility accounts in their territory. However, **no territory manager owns a territory or a customer**; Preferred Sales Agency is a team with many interchangeable parts. People . . . have flourished because they have willingly given up customers and income for the good of the team. They have been rewarded for their sacrifices.

*Id.* at 128-29. Although it's not clear which other TMs were asked to give up territory to give Mr. Dutton, some male TMs had been asked or required to give up territory in the past and, as described in more detail later, they confronted management and attempted to negotiate the changes.

The next day, June 9, 2007, Ms. Potter sent several e-mails. The first discussed the hard work others may put into an order but suggests their bonus for the sale should come out of a fund other than a commission split with a TM. *Id*. at 127. This e-mail followed:

> [O].k. Jim . . . yes, I hear you loud and clear getting digs in for sacrificing for the good of the whole once again. I sense continuing animosity on your part about my unwillingness to give up accounts. I want to be viewed as a team player and a producer and I thought I had been, and strive to be each day. If you do not share in this view, let's resolve it.
>
> I wasn't around when [others] made any sacrifices, but I realize Earl gave 80% of his accounts to Gary. Politically, it looks very generous. Yes, the territory assigned to me all used to belong to others, I get that too. But, nearly every account within this company belonged to someone else at one

- 8 -

time or another.  You say they have flourished because of the sacrifices they made?  You said they have been rewarded.  No one has talked to me about the rewards, just the sacrifice.  What would be my reward?   Since no one around here communicates about plans for the future, and seems to keep all plans very secret, it seems to me there are none and what I may give up today is gone without exchange.

If you and Earl want to talk about sacrificing territory again, why don't you, me, Earl, and Gary get together in your office next Thursday or Friday?  But, only if all 4 of us are there in the same room and can move forward in agreement of the scope of the change.  A joint meeting is what I should have requested . . . so we could have all been on the same page from the onset of that.  Another lesson learned the hard way—and you wonder why I have trust issues? . . .

If I'm forced to waive a white flag to prove I'm a team player and help my fellow TM, I will consider doing it.

However, before we try to make any new changes, consider if it really makes sense.   [Listing points and suggesting rearranging accounts from other TMs.]  Somehow, I'm betting the answer is 'no' to all of these. . . .

Although I use my voice and use it often, don't ever doubt that I know my place in this—or any—company: as long as I work for someone else, I'm not only interchangeable, but replaceable.  I know as long as I work at PSA I will always just be a worker bee, here to do as I'm told.  As much as I love it here and often feel like I get "buy in" on certain things, I'm not stupid—I know at the end of the day, I'm not on the board of directors, I'm not the CEO, I'm not family, and my request or opinion means virtually nothing.

I don't have any problem participating in a fair request, when it's fair to all and carried out equally among my peers in the same situation.  You, Earl and Steve said I earned a right to keep this territory just as I chose to keep it, once again – telling me it was my decision. So, why get upset and, in your words, disappointed, with me when I make that decision?  **<u>I'm disappointed</u>** when I'm told one thing but something else happens.

*Id.* at 123-24.

According to Mr. Tarpley, this e-mail was "the last straw." *Id.* at 89. Mr. Tarpley arranged to meet with Ms. Potter on June 14, 2007. She carried a tape recorder in her purse to record the conversation. Mr. Tarpley offered her a choice between resignation and termination. When Ms. Potter asked for an explanation, Mr. Tarpley said, "[I]t's very hard when someone's unhappy to go forward and based on your opinions that you've expressed it[']s obvious that you are unhappy and things aren't working out. . . . I don't see any other way based on the opinions you've expressed." Appx., Vol. II at 631. Ms. Potter refused to resign, so she was terminated.

B. *Procedural History*

Ms. Potter's complaint claimed (1) sex discrimination under 42 U.S.C. § 2000e–2(a)(1) ("Title VII"), (2) a state law tort of discriminatory termination (*Burk* claim), and (3) a state claim for failure to pay vacation pay and commissions.

As part of discovery, Synerlink produced Mr. Tarpley's handwritten notes of meetings he had with Ms. Potter and other employees over several years.[6] At his deposition, Mr. Tarpley testified the notes were the originals he took "at the time or shortly after the event." Appx., Vol. III at 1061. Later, Ms. Potter discovered through

---

[6] Mr. Tarpley's notes detailing nine meetings with Ms. Potter—the earliest September 21, 2005, and the latest June 8, 2007—criticized Ms. Potter's attitude, selfishness, and willingness to act as a team player. Ms. Potter denied some of the alleged meetings ever happened and testified Mr. Tarpley never counseled her about these criticisms.

- 10 -

the use of an expert that the notes of discussions with her were not originals. When confronted with this evidence, Mr. Tarpley admitted he re-copied all of these notes at a later date. Ms. Potter moved for sanctions and requested a default judgment based on Mr. Tarpley's initial misrepresentation that the notes were originals.

The magistrate judge found that Mr. Tarpley was deceptive in his answers at the deposition but could not conclude Mr. Tarpley rewrote his notes "in order to hide evidence or for the purpose of assisting [the] defendant in this case." *Id.* at 1063. Because some of the notes said positive things about Ms. Potter, the magistrate judge concluded the sanction of dismissal would be too severe. The district court awarded Ms. Potter monetary damages for the costs incurred in preparing her motion, re-deposing Mr. Tarpley, and her expert's fees.

Synerlink moved for summary judgment on all counts. At the summary judgment hearing, the district court orally granted Synerlink's motion for summary judgment on Potter's Title VII and state law *Burk* discrimination claims. The court concluded she failed to raise sufficient evidence of pretext despite her argument that male TMs were permitted to challenge management but she was fired for doing so. The district court also rejected Ms. Potter's contention that Mr. Tarpley's dishonesty about his notes undermined his credibility, instead concluding that Ms. Potter's "e-mails to [Mr.] Tarpley in the month before her termination support the company's contention that the relationship had soured because of her unwillingness to give up accounts when other territory managers did so." *Id.* at 1045. The court also granted Ms. Potter's summary

judgment on her claim for vacation pay sua sponte.  Synerlink did not object.  The court set the remaining issue, unpaid commissions, for trial.

The jury found Synerlink owed Ms. Potter $47,244.83 in unpaid commissions.  It also found Ms. Potter and Synerlink had a bona fide disagreement over whether the commissions were owed, and therefore, under Oklahoma law, Ms. Potter was not entitled to liquidated damages.  The court granted Ms. Potter 6% prejudgment interest on the unpaid commissions accruing from November 14, 2008, (the date she filed her complaint), to May 25, 2011.  It awarded post-judgment interest at a rate of 0.19%.  Following trial, Ms. Potter moved for attorney fees and costs.  Synerlink responded with a request for an offset due because an offer of judgment it made before trial was higher than the jury's award.  Over Ms. Potter's objection, the court granted the offset.

Ms. Potter appeals, challenging the grant of summary judgment on her (A) Title VII and (B) state law *Burk* discrimination claims; (C) the submission of the liquidated damages issue to the jury and the jury instructions on Synerlink's bona fide disagreement defense to liquidated damages; and (D) the date on which the court commenced the accrual of prejudgment interest.  In a related appeal, Ms. Potter challenges (E) the district court's order adopting the magistrate judge's report and recommendation on Ms. Potter's post-judgment motion for attorney fees and costs.

## II.  DISCUSSION

### A. *Title VII Discrimination*

Title VII prohibits an employer from firing an employee on the basis of the individual's sex.  42 U.S.C. § 2000e–2(a)(1).  Ms. Potter claims Synerlink fired her

- 12 -

because she did not meet its stereotypical expectations for women:  Synerlink did not fire male TMs for "butting heads" with management, but she was fired for doing so because she is female.

Because Ms. Potter relies on circumstantial evidence, we use the three-step analysis outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).  *See Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).  This burden-shifting test requires (1) the employee to "establish[] a prima facie case" of discrimination, *McDonnell Douglas Corp.*, 411 U.S. at 802; (2) the employer to show that it had a "legitimate, nondiscriminatory reason" for its action, *id.*; and (3) the employee to show that the employer's legitimate reasons are "mere pretext" for impermissible discrimination, *id.* at 798.

We review a district court's grant of summary judgment de novo, "using the same standard applied by the district court pursuant to Fed. R. Civ. P. 56(a)."  *Cillo v. City of Greenwood Village*, 739 F.3d 451, 461 (10th Cir. 2013); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).  We must "view facts in the light most favorable to" the non-moving party, Ms. Potter, "resolving all factual disputes and reasonable inferences" in his favor.  *Cillo*, 739 F.3d at 461.  Summary judgment shall be granted if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Cillo*, 739 F.3d at 461.  "A fact is material if, under governing law, it could [affect] the outcome of the lawsuit."  *Cillo*, 739 F.3d at 461 (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184,

1190 (10th Cir. 2000)).  A factual dispute is "genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.* (quotations omitted).

1.  **Prima Facie Case**

First, Ms. Potter has the burden of proving by a preponderance of the evidence a prima facie case of discrimination.  This is "not onerous."  *Plotke*, 405 F.3d at 1099.  A prima facie case of discriminatory treatment requires proof she (1) is a member of a protected class; (2) suffered an adverse employment action; and (3) was terminated under circumstances giving rise to an inference of discrimination.  *See EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007).  In a stereotyping claim, Ms. Potter may meet the last element by showing Synerlink discriminated against her based on her failure to conform to stereotypical gender norms.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) *superseded on other grounds by statute*, 42 U.S.C. § 2000e-2(m), *as recognized in Burrage v. United States*, 134 S. Ct. 881, 889 n.4 (2014); *see also Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1223 (10th Cir. 2007).  Synerlink acknowledged at oral argument that for the purposes of this appeal, it concedes that Ms. Potter has demonstrated a prima facie case.

We agree.  Because Ms. Potter is female, she is a member of a protected class and satisfies the first element of a prima facie case.  Because Synerlink terminated Ms. Potter, an adverse employment action, she satisfies the second element.  Ms. Potter exceeded sales expectations, and Synerlink terminated her despite her success.  Ms. Potter points to evidence indicating she was fired for airing grievances with management but male TMs were not.  She therefore satisfies the third element.  We proceed to the next *McDonnell-*

*Douglas* step.

## 2. **Legitimate Nondiscriminatory Reason**

Second, because Ms. Potter has made out a prima facie claim, the burden of production shifts to Synerlink, which must present a legitimate nondiscriminatory reason for its action. *Id.* at 1224. Mr. Tarpley articulated Synerlink's reason: "The primary reason I terminated [Ms. Potter's] employment was based on [her] ongoing failure to work as a team player, an issue which culminated in a series of combative emails sent by [Ms. Potter] to me and other members of management in June of 2007." Appx., Vol. I at 334. For the purposes of this appeal, Ms. Potter concedes that Synerlink met its burden here. Aplt. Br. at 13. The district court determined this is a legitimate nondiscriminatory reason, and we agree.

## 3. **Pretext**

Third, because Synerlink has articulated a legitimate nondiscriminatory reason for firing Ms. Potter, she must show Synerlink's reason is pretextual. At summary judgment, we need only determine whether the evidence Ms. Potter presented, viewed in a light most favorable to her, could allow a reasonable jury to find that Synerlink's reasons were pretextual. *See Etsitty*, 502 F.3d at 1220. "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Id.* at 1225 (quotations omitted). Proof of "differential treatment of similarly-situated employees may support a finding of pretext." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1199 (10th Cir. 2000) (emphasis omitted); *see also Smothers v. Solvay Chemicals, Inc.*, 740

F.3d 530, 547 (10th Cir. 2014) ("If an employer's proffered legitimate reason for a termination is factually true . . . the reason may nevertheless be deemed pretextual if circumstances suggest that it does not adequately explain the employer's actions—for example, if the employer was more lenient with similarly-situated employees who committed the same violation.").

Ms. Potter need not actually show that "the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003); *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (holding it is sufficient for the plaintiff to cast general doubt on the employer's reasons for her termination so that "the jury could reasonably find the employer lacks credibility"). "A pretext finding in a *McDonnell Douglas* analysis allows a jury to infer that the employer's decision was motivated in substantial part by a *specific* motive made unlawful under federal law" such as discrimination based on sex. *Smothers*, 740 F.3d at 547.

Ms. Potter contends Synerlink's reasons for her termination are pretextual for three reasons: (a) Synerlink's treating her differently from male TMs who also expressed dissatisfaction with management; (b) Mr. Tarpley's compromised credibility undermining his stated reason for firing her; and (c) Synerlink's general culture of discrimination. We conclude she raised a genuine issue of fact about pretext based on both disparate treatment and Mr. Tarpley's impugned credibility and that summary judgment was not appropriate. We do not address Ms. Potter's third reason.

    a. *Disparate treatment of Ms. Potter relative to male co-workers*

- 16 -

A plaintiff can demonstrate an inference of discrimination/pretext by showing "the employer treated similarly situated employees more favorably." *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). Ms. Potter contends the male TMs were allowed to confront and argue with Mr. Tarpley regarding territory adjustments without being disciplined at all. But when a woman took the same approach, "that was over the line." Aplt. Br. at 31.

The district court determined Ms. Potter's claim of disparate treatment "is not sufficient without specific examples" of male TMs expressing disagreement without receiving discipline. Appx., Vol. III at 1044. The district court, however, overlooked the deposition testimony of male TMs Jason Irons and Johnny Hopkins.

Mr. Irons testified that he had "butt[ed] heads," "talk[ed] things out," and "ask[ed] a lot of questions" when the TMs were required to "change territories, when territories [we]re taken[,] . . . or swapped from one TM to the next . . . ." Appx., Vol. II at 603. He asked these questions "in an inquisitive way, not a challenging way," but also admitted he did not know if others perceived this as challenging to management. *Id*.

Mr. Hopkins testified that when Synerlink announced changes to his territory, negotiations with management followed involving "expressing concerns or opportunities back and forth" about commissions and growth. *Id*. at 617. He also stated that "any time there's a change, there's a concern" because of "uncertainty." *Id*. at 618-19. Like Ms. Potter, when faced with changes in territories, male TMs raised concerns, negotiated, and challenged Synerlink's management.

Mr. Tarpley had actually invited Ms. Potter to share her concerns, but unlike the

- 17 -

male TMs, he fired her when she did so.  In the email Mr. Tarpley viewed as the "last straw," Ms. Potter requested a meeting with management to discuss her concerns, much as the male TMs testified they did.  *See* Supp. Appx., Vol. I at 89, 123-24.  Instead of discussing her concerns at the meeting, Mr. Tarpley fired her, stating,[7] "I think that you probably expressed all of your opinions already and based on your opinions things aren't working out. . . . [It's] very hard when someone's unhappy to go forward and based on your opinions that you've expressed it[']s obvious that you are unhappy and things aren't working out. . . . I don't see any other way based on the opinions you've expressed." Appx., Vol. II at 631.[8]

Evidence of Synerlink's disparate treatment of Ms. Potter relative to the male TMs in responding to their expressed concerns about territory changes is sufficient to withstand summary judgment.  A reasonable jury could conclude Ms. Potter's expressions of concern were similar to Mr. Irons's and Mr. Hopkins's, and that

---

[7] This quote comes from an audio recording of the meeting.

[8] Synerlink correctly points out that the business judgment rule presumes a bona fide regard for the interests of the company but this rule does not prevent all review of employment actions.  *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1169 (10th Cir. 1998) (noting we cannot insulate all business judgments from judicial review or we would defeat the purpose of laws protecting against employment discrimination).  We do not address whether Synerlink's termination of Ms. Potter was warranted under the circumstances or was in the company's best interest.  Our issue is limited to whether a reasonable jury could conclude Synerlink fired Ms. Potter motivated in substantial part by stereotyping discrimination.  *See Smothers*, 740 F.3d at 547.

Synerlink's rationale for firing her was pretextual.[9]

   b. *Supervisor Tarpley's credibility*

Mr. Tarpley was the decision maker at Synerlink who both hired and fired Ms. Potter.[10] At the time of her termination, Mr. Tarpley said he was firing her because, based on the opinions she had expressed, she was unhappy and things were not working out. Ms. Potter challenges the veracity of this explanation. She argues Mr. Tarpley's statements would not be credible before the jury because he lied about the "re-copied" notes and destroyed the originals, possibly after this lawsuit commenced. We agree that Mr. Tarpley's credibility problem raises a genuine issue of material fact as to pretext.[11]

---

[9] Record evidence also supports Synerlink. Ms. Potter admitted in her deposition, "I'm not aware of anyone who had the same type of conversation I had with [Mr. Tarpley]." Suppl. Appx., Vol. I at 63. Mr. Roberson testified: "Nobody ever came on as strong in writing as what Stacey did. . . . Nobody in the history of our company had ever come on that strong attacking so many people in our company." Appx., Vol. II at 586.
   We do not, however, weigh evidence on summary judgment, and when a reasonable jury *could* find *for* the nonmoving party, summary judgment is inappropriate. Comparing tones between the male TMs' deposition testimony and Ms. Potter's emails involves weighing evidence, which is the jury's role. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012) (On summary judgment, "[w]e must not judge witness credibility or weigh evidence.").

[10] Synerlink suggests because Mr. Tarpley both hired and fired Ms. Potter, he is granted the benefit of the "same actor inference." *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183-84 (10th Cir. 2006) (holding there is a strong inference of no pretext for discrimination when the same actor hires and fires an employee within 10 months).
   This inference does not apply here. Mr. Tarpley hired Ms. Potter three and a half years before he fired her. In *Antonio*, in line with many of our sister circuits, we limited same-actor inferences to cases in which "the employee was hired and fired by the same person within a relatively short time span." *Id.* at 1183 (quotation omitted).

[11] We are not determining whether Mr. Tarpley is credible or not, but merely
(Continued . . . )

- 19 -

Synerlink produced Mr. Tarpley's handwritten notes from his meetings with Ms. Potter about her job performance. He testified in his deposition that these notes were taken contemporaneously with the meetings. Ms. Potter later discovered through the use of an expert that the notes were not the originals. Confronted with this information, Mr. Tarpley admitted he had copied the notes from originals in his possession, then destroyed the originals. He explained this had been his routine note-taking habit and he had considered the rewritten notes to be the originals when he gave his deposition testimony. The magistrate judge sanctioned Synerlink for Mr. Tarpley's misrepresentation by awarding Ms. Potter monetary damages for the costs incurred in preparing her motion, re-deposing Tarpley, and her expert's fees. The district court had this information when it considered and denied summary judgment on the discrimination claim.[12]

The fact Mr. Tarpley misrepresented the nature of his notes concerning his counseling sessions with Ms. Potter undermines the credibility of his stated reason to fire her and therefore raises a genuine issue as to pretext. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2726 (3d ed. 1998) ("[I]f

---

indicating there is a genuine issue as to pretext based on his credibility that a jury should decide.

[12] On April 20, 2010, the magistrate judge granted Ms. Potter's motion for sanctions in part with a written order forthcoming. The magistrate judge issued its written order on November 10, 2010, two months after the district court's ruling granting Synerlink summary judgment on Ms. Potter's discrimination claims. The district court indicated, however, in a hearing on summary judgment and in its ruling on summary judgment that it was aware Mr. Tarpley misrepresented the nature of his notes, Appx., Vol. III at 1043, and the magistrate judge was likely ordering sanctions, *id.* at 990.

the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial . . . ."); *see also TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004); *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002) (quoting Wright, Miller & Kane); *Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 575 (7th Cir. 1987) (quoting Wright, Miller & Kane).

Additionally, the district court noted a factual dispute about the counseling sessions: Mr. Tarpley said he counseled Ms. Potter multiple times over eighteen months about not being a team player; Ms. Potter denied there were such counseling sessions. The district court considered this matter irrelevant once it determined there was at least one session.[13] A reasonable jury, however, could determine Mr. Tarpley exaggerated the frequency of the counseling sessions (both in his deposition and through his "re-copied" notes) to suggest that Ms. Potter had an ongoing attitude problem not limited to her emails, and thereby question whether his stated reason for the termination was pretextual.

* * *

In sum, we conclude Ms. Potter has raised a genuine issue of material fact as to pretext based on disparate treatment and Mr. Tarpley's credibility. We therefore reverse

---

[13] Although Synerlink did not use the notes to support summary judgment, we may still consider them because Ms. Potter argued before the district court that Mr. Tarpley's dishonesty about the notes could impeach his credibility. Mr. Tarpley's explanation for firing her and whether it is a pretext is a crucial part of the case.

- 21 -

the district court's grant of summary judgment on the Title VII claim.

### B. *State Discrimination Claim under* **Burk**

Ms. Potter also alleged a discrimination claim for her termination under state law. When she filed her complaint, Oklahoma courts recognized a tort for termination of an at-will employee "in a narrow class of cases" when the termination "is contrary to a clear mandate of public policy as articulated by constitutional, statutory or decisional law." *Burk v. K-Mart Corp.,* 770 P.2d 24, 28 (Okla. 1989); *see also Armstrong v. State ex rel. Okla. Ins. Dep't*, 278 P.3d 1, 5 (Okla. Civ. App. 2011) (citing *Burk*).[14]

"A viable *Burk* claim must allege (1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal." *Vasek v. Bd. of Cnty. Comm'rs*, 186 P.3d 928, 932 (Okla. 2008). "[A] plaintiff may pursue a state law *Burk* tort claim for wrongful discharge in violation of public policy"

---

[14] At the time Ms. Potter sued, the Oklahoma Antidiscrimination Act ("OADA") provided for a private right of action only for disability-based discrimination claims. *See Tate v. Browning-Ferris, Inc.*, 833 P.2d 1218, 1229-31 (Okla. 1992). A *Burk* claim afforded a common law action to seek redress for other types of status-based discrimination.

The Oklahoma legislature amended the OADA, effective November 1, 2011, to create a statutory cause of action for employment discrimination based on sex and other protected classes and to abolish common law remedies. Okla. Stat. tit. 25, §§ 1101(A), 1350(A). Synerlink does not challenge her right to maintain this action based on *Burk* after the amendment.

- 22 -

for discrimination based on "race, color, religion, sex, national origin, age, and handicap." *Shirazi v. Childtime Learning Ctr., Inc.*, 204 P.3d 75, 79 (Okla. 2009); *Sanchez v. Phillip Morris, Inc.*, 992 F.2d 244, 248 (10th Cir. 1993) ("Oklahoma recognizes a separate public policy tort claim for plaintiffs alleging facts sufficient to state a claim that they were wrongfully discharged in violation of, *inter alia,* Title VII, despite Oklahoma's historical adherence to the employment-at-will doctrine.").

All parties acknowledge a *Burk* claim will generally succeed or fail for the same reason as the related federal claim. *See id.* Because Ms. Potter has presented sufficient evidence for a reasonable jury to find in her favor on her Title VII claim, we reverse the district court's grant of summary judgment to Synerlink on Ms. Potter's *Burk* claim.

## C. *Liquidated Damages*

Ms. Potter claims the district court erred twice in handling her claim for liquidated damages for her unpaid commissions. First, she says the court should have awarded her liquidated damages without needing to submit the issue to the jury. Second, she asserts the court mis-instructed the jury on liquidated damages. Some legal and procedural background is needed to understand how these issues emerged.

Oklahoma's Protection of Labor Act ("PLA"), Okla. Stat. tit. 40, § 165.3, states that when an employee's job is terminated, the employer must timely "pay the employee's wages in full, less offsets and less any amount over which a bona fide disagreement exists . . . ."). Under § 165.3(B), an employer who fails to pay claimed wages is "additionally liable to the employee for liquidated damages in the amount of two percent (2%) of the unpaid wages for each day . . . after the day the wages were earned

- 23 -

and due if the employer willfully withheld wages over which there was no bona fide disagreement; or in an amount equal to the unpaid wages, whichever is smaller . . . ." *See Campbell v. Indep. Sch. Dist. No. 1*, 77 P.3d 1034, 1040-41 (Okla. 2003). Section § 165.4(A)(2) bars an employer from alleging a bona fide disagreement over the wages claimed if it fails to provide a written explanation of why it disputes the wages claimed within 15 days from receipt of a written demand.[15]

Ms. Potter contends her complaint in this case served as a written demand for her unpaid commissions. Synerlink did not file an answer to her complaint within 15 days of service,[16] and it did not explain why it disputed any wage claims.

The district court denied summary judgment regarding whether Ms. Potter was entitled to the unpaid commissions. Just prior to trial, Ms. Potter and Synerlink stipulated that if Synerlink owed Ms. Potter commissions, the amount owed was $47,244.83. At trial, Ms. Potter sought commissions in the stipulated amount plus liquidated damages in the same amount. Synerlink defended against liquidated damages on the basis of having a bona fide dispute about whether Ms. Potter was entitled to the commissions.

---

[15] "In order to successfully allege a bona fide disagreement over the amount of wages, the employer shall: . . . [p]rovide to the employee, within fifteen (15) days of either receipt of a wage claim form . . . or certified mail receipt of written demand from an employee, written explanation of the relevant facts and/or evidence which supports the belief of the employer that the wages in dispute are not owed." Okla. Stat. tit. 40, § 165.4.

[16] Federal Rule of Civil Procedure 12(a)(1)(A)(i) required Synerlink to answer the complaint within 21 days of service. It answered the complaint 17 days after being served.

At a pretrial conference, the district court said it intended to give the jury an instruction on the bona fide dispute defense to liquidated damages. Ms. Potter objected, claiming Synerlink had procedurally defaulted such a defense when it failed to respond to her written demand (her complaint) within the 15-day statutory time limit.

The district court determined Synerlink was not required to provide a written explanation under § 165.4(A)(2) because the complaint provided insufficient notice to trigger the statute's 15-day time requirement. The complaint failed to specify a response was due under the statute. *Id.* at 1158 ("It was unclear that [Ms. Potter's complaint] was making a statutory demand requiring a statutory written explanation pursuant to the wage act in addition to any response required by the Federal Rules of Civil Procedure.").[17]

In Jury Instruction No. 17, the district court instructed the jury that if it found Synerlink failed to pay commissions owed, "then you must also find, by a separate verdict, whether the plaintiff is entitled to liquidated damages pursuant to Title 40 Okla. Stat. § 165.3(B)." Appx., Vol. III at 1231. It further informed the jury that "[a] party claiming liquidated damages has the burden of proving that the employer willfully withheld commissions over which there was no bona fide disagreement." *Id.*

---

[17] Ms. Potter claims the district court "had it right" when it stated during the summary judgment hearing that Synerlink's failure to follow the statutory procedure "expos[ed] it to liquidated damages under Section 165.3." Aplt. Br. at 53 (11-5092); *see* Appx., Vol. III at 1051. The record is unclear, however, whether the court's statement was a ruling or simply a restatement of Ms. Potter's position. Even if it were a ruling, the court could change its position after the evidence was presented at trial without committing error. *See DLB Energy Corp. v. Okla. Corp. Comm'n*, 805 P.2d 657, 660 (Okla. 1991).

Ms. Potter argues the court erred by giving the liquidated damages issue to the jury and then by instructing the jury that she bore the burden of proof on a "bona fide disagreement."

1. **Submitting Liquidated Damage to the Jury**

On appeal, Ms. Potter argues the district court erred by submitting the liquidated damages question to the jury. She asserts Synerlink forfeited its ability to contest the issue by not timely responding to her written demand. Ms. Potter argues her complaint was a written demand for wages sent by certified mail that imposed two obligations on Synerlink. First, Synerlink needed to answer the complaint under the relevant court rules. Second, under Okla. Stat. tit. 40, § 165.4, Synerlink needed to provide her a complete explanation within 15 days of why it disputed her wage demand to preserve its bona fide disagreement defense. Synerlink argues the complaint was not a written demand because the PLA required Ms. Potter to send a demand letter before initiating litigation.

We conclude Ms. Potter's complaint was not sufficient to trigger Synerlink's duty to respond under the PLA because it did not give Synerlink notice of her reliance on § 165.4.[18] Because Ms. Potter failed to assert her demand under the statute, Synerlink was not told of its duty to present a written explanation.

The purpose of § 165.3(B) is "to impose a penalty on an offending employer" for failure to timely respond to a written demand. *Campbell*, 77 P.3d at 1041. Synerlink's

_____

[18] Neither the PLA nor Oklahoma case law has addressed the required contents of a written demand sufficient to trigger a duty to respond.

- 26 -

failure to provide a complete explanation within 15 days of receiving Ms. Potter's complaint was not blameworthy because Ms. Potter's complaint neither asserted her right to a separate response nor mentioned § 165.4. There is no evidence Synerlink knowingly refused to comply with a demand for information or "willfully withheld" payment. *See* Okla. Stat. tit. 40 § 165.3 (B).

Because the district court correctly determined Synerlink was not on notice to respond and therefore had not forfeited its "bona fide disagreement" defense at trial, the court correctly submitted to the jury the question of whether Synerlink owed liquidated damages.

2. **Jury Instruction on Bona Fide Disagreement**

Ms. Potter further argues the district court's instruction erroneously shifted the burden of proof to her because the existence of a bona fide disagreement is an affirmative defense that Synerlink must establish under Okla. Stat. tit. 40, § 165.4.

Although Ms. Potter objected to Jury Instruction No. 17 on the ground that the "bona fide disagreement" defense should not be "available" to Synerlink, Appx., Vol. III at 1160 ("[W]e believe that the instruction fails to include the affirmative duty of the employer to respond to the claim by the employee and without responding the affirmative defense of bona fide disagreement is not available."), she did not clearly object that the instruction improperly burdened her with disproving this defense.

We review issues raised for the first time on appeal for plain error. *See Eller v. Trans Union, LLC*, 739 F.3d 467, 480 (10th Cir. 2013). "Plain error occurs when there is (i) error, (ii) that is plain, which (iii) affects the defendant's substantial rights, and which

- 27 -

(iv) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotations omitted). An appellee seeking review under plain error must satisfy all four elements.

In her opening brief, Ms. Potter did not argue the district court plainly erred. In her reply brief, she argued the first two elements of plain error—(i) error (ii) that is plain—but she did not argue the third or fourth elements. Accordingly, she has not presented a full plain error argument on appeal, and this issue is therefore waived. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal[ ]surely marks the end of the road for an argument for reversal not first presented to the district court.").

D. *Prejudgment Interest*

The district court awarded prejudgment interest on unpaid commissions from November 14, 2008, the date Ms. Potter filed her complaint, through May 25, 2011. Ms. Potter contends interest should have started accruing on the payday following her termination, not when she filed her lawsuit.

Under Oklahoma law, a party who is "entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ." Okla. Stat. tit. 23, § 6.

Ms. Potter asserts payment of her commissions was due—and thus prejudgment interest began accruing—on June 15, 2007, the first payday following her termination. *See* Okla. Stat. tit. 40, § 165.3. She concedes, however, that TMs did not receive their

- 28 -

commissions until one month after the clients paid Synerlink. *See* Suppl. Appx., Vol. I at 69.

On November 29, 2010, during this litigation, Ms. Potter and Synerlink stipulated to the amount of commissions owed from her sales. Although her commissions owed may have been calculable before that date, no evidence shows when Synerlink received payment from Ms. Potter's clients after she left Synerlink. Without this evidence, the district court could not ascertain when the commissions should have been paid. The district court therefore did not err in refusing to calculate prejudgment interest from any time earlier than November 14, 2008, the date Ms. Potter filed her complaint.[19]

### E. *Attorney Fees and Offer of Judgment*

Ms. Potter received an award of $53,244.83 plus prejudgment interest on her commissions and vacation pay claims. Following the trial, Ms. Potter requested attorney fees and costs. Synerlink did not object to the fees but requested an offset based on an earlier offer of judgment it had made to Ms. Potter. The district court granted the offset over Ms. Potter's objection. On appeal, Ms. Potter argues the district court erred because Synerlink's offer of judgment was not correctly presented.

Under Okla. Stat. tit. 12, § 1101.1, a defendant may make offers of judgment at any time more than 10 days prior to trial. *Id.* If "the plaintiff rejects the [defendant's] offer of judgment and the judgment awarded the plaintiff is less than the . . . offer of

---

[19] It is not clear why the district court chose the date of the complaint to start prejudgment interest instead of the date of the stipulation, but Synerlink has not cross-appealed that issue and Ms. Potter argues only the date should be earlier.

judgment, then the defendant filing the offer of judgment shall be entitled to recover the reasonable litigation costs and reasonable attorney fees incurred . . . offset from the judgment entered against the offering defendant." *Id.* § 1101.1(A)(3); *see also id.* § 1101.1(B)(3) (same).

Synerlink made an offer of judgment after the district court's partial summary judgment rulings on the discrimination claims and vacation pay, but before trial on the unpaid commissions claim. The offer of judgment at issue here[20] stated:

> Pursuant to . . . § 1101.1(B), Defendants . . . offer to allow judgment to be taken against them in the total amount of $120,000.00, including attorneys' fees and costs. If accepted, this amount will resolve all claims, whether currently pending, on appeal, or with potential appeal.
>
> This Offer of Judgment is made solely for the purpose specified in . . . § 1101.1(B), and is not to be construed either as an admission that Defendants are liable in this action or that Plaintiff . . . has suffered any damage.

Appx., Vol. II at 248 (12-5117). Ms. Potter did not respond to this offer.

Following trial, Ms. Potter filed for attorney fees and costs. Synerlink asked for an offset because its offer of judgment ($120,000) was higher than Ms. Potter's award ($53,244.83). Ms. Potter objected to an offset, arguing Synerlink's offer of judgment was not valid for two reasons: (1) her *Burk* claim was based on the OADA; thus any offer of judgment must come under § 1101.1(A) instead of (B), and to decide otherwise would violate the Oklahoma Constitution; and (2) Synerlink could not offer to settle the Title

---

[20] Synerlink had sent an earlier offer of judgment which is not at issue in this appeal.

VII and *Burk* discrimination claims the district court resolved by granting summary judgment.[21]

The magistrate judge rejected Ms. Potter's arguments and recommended Synerlink be allowed an offset against the fees owed to her. Ms. Potter objected to the recommendation, reiterating her arguments, and also requested certification of the constitutional question to the Oklahoma Supreme Court. The district court denied her request and accepted the magistrate's report and recommendation. Ms. Potter appeals.

In light of our decision on the Title VII and *Burk* claims, we decline to address this issue. Although Ms. Potter's award after trial was less than Synerlink's offer of judgment for $120,000, this case is not yet over. Because we reverse the district court's grant of summary judgment and remand Ms. Potter's discrimination claims for trial, a jury could award Ms. Potter more damages, potentially increasing Ms. Potter's award to over $120,000.

We therefore vacate the offset portion of the district court's order regarding attorney fees and remand to address this issue anew at the appropriate time.

---

[21] As to Ms. Potter's second argument, we agree with the district judge that an offer of judgment under § 1101.1(B) need not be limited to the claims proceeding toward trial and therefore could include the discrimination claims. Synerlink made its offer of judgment after the district court granted partial summary judgment, but the case was not over: because a partial summary judgment ruling is interlocutory, the district court could revisit it any time. *See Fye v. Okla. Corp. Com'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008) (noting partial summary judgment is not final and the district court has a "general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment" (quotations omitted)).

## III. CONCLUSION

Based on the foregoing, we reverse the district court's grant of summary judgment on Ms. Potter's Title VII and *Burk* discrimination claims. We affirm the district court's decision regarding liquidated damages and prejudgment interest. We vacate the offset portion of the district court's order regarding attorney fees. We remand for further proceedings consistent with this opinion.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge

11-5092, Potter v. Synerlink Corporation
**O'BRIEN, J.**, Circuit Judge, dissenting:

The undisputed evidence in this case does not raise a material issue of disputed fact regarding pretext. Accepting as true Potter's version of all disputed issues, she fails to show disparate treatment or Tarpley's lack of credibility in justifying the termination of her employment. Sifting through her plentiful allegations to reach the factual core of her claims, her e-mails dictate the outcome—she pushed too hard, crossed the line, and was fired for doing so. Because she fails to present any evidence to cast doubt, I respectfully dissent.

Disparate Treatment

Potter bears the burden of showing a weakness, implausibility, inconsistency, or contradiction in Synerlink's "claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." *Timmerman v. U.S. Bank, N.A.*, 493 F.3d 1106, 1113 (10th Cir. 2007). My colleagues conclude her evidence is sufficient for trial on her claim that gender played a significant role in her termination. But our focus should be narrow, deciding whether there is a genuine factual dispute as to the only material fact of significance: whether her insubordinate and insulting conduct was of "comparable seriousness" to that of her male counterparts, which was tolerated. *See McGowan v. City of Eufaula*, 472 F.3d 736, 745 (10th Cir. 2006) ("[E]ven employees who are similarly situated must have been disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to be relevant.").

According to Potter, the male TMs were allowed to confront and argue with Tarpley regarding territory adjustments, but when a woman took the same approach, "that was over the line." (Appellant's Br. 31.) However, contrary to the Majority's reading of the testimony, I find no support for Potter's contention that her "approach" was similar to the male TMs.

A comparison of the male TMs' testimony as to the substance of Potter's e-mails is enlightening. As Irons testified, "I butt heads with everybody. . . . I'm a guy who likes to talk things out. . . . I would ask the question, what's the reasoning . . . in an inquisitive way, not a challenging way." (App'x Vol. II at 603.) And as Hopkins testified, he would discuss territory changes with management, typically resulting in "negotiations." (*Id.* at 617.) While he would express concerns regarding future opportunities for commission growth and the growth of the company, he explained it "was always a trust factor," and in his experience, things had "worked out." (*Id.* at 619.) The majority concludes this testimony shows the male TMs, "like Potter, . . . raised concerns, negotiated and challenged Synerlink's management." (Majority Op. at 17.) But the record shows Potter did much more than "raise concerns" and "negotiate" regarding changes in her accounts.

Even though Potter may have begun her objections to management's request for her to transfer accounts to Dutton in a conciliatory manner in December 2006, ("let's look at it again in a few months"), by April 2007, her e-mails went far beyond negotiations or straightforward discussion. She not only criticized management's decisions ("Now, I can look forward to being rewarded for my efforts by being penalized with a potential territory reduction and commission cut because a new salesman was

hired prematurely?"), but objected to any negative consequences to her bottom line that the management's decision may impose, ("I am not in favor of handing over pieces of my territory just because the decision to hire him may have been a gamble."). (App'x Vol. II at 650; Appellee's Supp. App'x Vol. I at 121, 129.)

By June 2007, the e-mails from Potter had criticized Tarpley personally for events spanning years, criticized the company's honesty with employees, criticized other employees' work, and only grudgingly agreed to discuss matters, but on her own terms[1]—"If I'm *forced* to waive a white flag to prove I'm a team player and help my fellow TM, I will *consider* doing it." (*Id*. at 123 (emphasis added).)

_____

[1] For example, in a June 7 e-mail, she wrote, "If you [Tarpley] are the Pres[ident] of PSA and have no authority over SynerLink nor the Buy/Resell companies, . . . who can verify the commissions to be paid to the TM's going forward? You said in the conference call that nothing would change, but it seems to be changing at least in interpretation.") (Supp. App'x Vol. I at 129.) Her follow-up e-mails continued to reject Tarpley's assurances her commissions would continue. On June 9, she complained, "You say they have flourished because of the sacrifices they made? You said they have been rewarded. No one has talked to me about the rewards, just the sacrifice. What would be my reward? Since no one around here communicates about plans for the future, and seems to keep all plans very secret, it seems to me there are none and what I may give up today is gone without exchanges." She later wrote, "I know as long as I work at PSA I will always just be a worker bee, here to do as I'm told. As much as I love it here and often feel like I get 'buy in' on certain things, I'm not stupid – I know at the end of the day, I'm not on the board of directors, I'm not the CEO, I'm not family, and my request or opinion means virtually nothing." (*Id*. at 123-24). At the same time she was criticizing management's strategy, transparency, and honesty, she targeted other employees. As to one employee, she asked Tarpley, "Did you or did you not tell him that I would be responsible for setting margins and selling prices for [this customer]? You said you told him, so why would he do this? Is he deaf or just stupid?" (*Id*. at 125.) Discussing the accounts which had gone to Dutton, she dismissed the contributions of another employee, saying, "I realize Earl gave 80% of his accounts to Gary. *Politically*, it looks very generous." (*Id*. at 123 (emphasis added).) And in regard to her estimate of

(Continued . . . )

By all accounts the tone, tenor, and tempo of Potter's tirades were unprecedented. So were her insubordinate accusations and insults. The substance of her e-mails speaks for itself. Even she had to admit in her deposition, "I'm not aware of anyone who had the same type of conversation I had with [Tarpley]." (Supp. App'x Vol. I at 63.) And Roberson testified: "Nobody ever came on as strong in writing as what Stacey did. Those string of e-mails start in April, May, June of '07. Nobody in the history of our company had ever come on that strong attacking so many people in our company." (App'x Vol. II at 586.) Potter's expression of her opinions in her e-mails is a far cry from professional conversations regarding negotiations and shared concerns described as the approach taken by Irons and Hopkins.

This is not a mere difference in degree, but a difference of kind. Potter provided no evidence of other TMs engaging in conduct "comparatively serious" in their discussions with management. There are no disputes about material facts, and no weighing of the evidence is required. An undifferentiated analysis of the facts should not force a barely plausible case to go to trial. Lacking hard evidence, the majority retreats to generalities. But generalizations do little to inform the debate; focused and particularized attention to the facts is required. "Where the record taken as a whole could not lead a rational trier of fact to find for the [party claiming injury], there is no genuine issue for

---

the work of another TM, she suggested his client should be given to Dutton because his failure to work the client made it "low hanging fruit," but then asked "[o]r is it one of the untouchables?" (*Id*. at 124.)

trial." *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986) (quotations omitted). "[M]etaphysical doubt as to the material facts" is not enough. *Id.*

Male TMs may have questioned management decisions and pushed back to some degree on decisions affecting them, but there is no evidence (as Potter is obliged to produce) that their actions came even close to Potter's critical, obnoxious, insulting, and accusatory behavior. The devil is in the details, which the majority studiously avoids for obvious reasons: there are none showing male TMs' behavior to be equivalent to Potter's. Synerlink's management hired Potter over a male applicant, went out of its way to help her succeed and applauded her success. Things were rosy until Potter was asked to make a sacrifice for others in the company, as others had done for her. Only then did it turn ugly. Fairly regarded, the <u>established</u> and undisputed facts support neither an inference of discrimination nor of pretext on the part of Synerlink. Potter was sacked because her behavior descended to a level that was both unprecedented and unacceptable. The anti-discrimination statutes should provide protection, not preference. Protected class members ought not to be insulated from the consequences of their intemperate behavior under the guise of fair and equal treatment.

Employer Credibility

Contrary to the Majority's conclusion, the substance of Tarpley's rewritten notes is immaterial to the district court's grant of summary judgment. Tarpley's conduct during discovery surely raises questions about his integrity generally. In many circumstances, this type of dishonesty may preclude summary judgment. But as the Majority recognizes, there must be a "specific basis for impeachment" before summary

- 5 -

judgment is denied. *See TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) ("TypeRight points to a number of facts that raise doubts as to the *credibility of the proffered evidence*.") (emphasis added); *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002) (" Credibility issues such as the sincerity of an employee's religious belief are quintessential fact questions."); *Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 575 (7th Cir. 1987) ("[O]n the current record, [the witness's] credibility is a matter of legitimate inquiry. The possible inconsistency with respect to his description of his visitation practice is certainly a matter for legitimate exploration.").

Here, the judge's summary judgment conclusion was not based on Tarpley's disputed counselling sessions with Potter. Rather, Synerlink relied on contemporaneous documents, many written by Potter, as the foundation for its employment decision. Neither the notes offered in discovery, nor the conversations they allegedly reflected, were offered as evidence.

> Tarpley's affidavit in support of summary judgment states in relevant part:
>
> The company terminated Plaintiff's employment for legitimate, non-discriminatory, business-related reasons—namely, and as evidenced by the tone of Plaintiff's own e-mails to management shortly before the termination, Plaintiff's failure to work as a team player regarding, among other things, redistribution of accounts among the Territory Managers. . . . [and]

(App'x Vol. I at 327.)

> The 'last straw' for me was an email from Plaintiff to me dated June 9, 2007 . . . .

(*Id.* at 333.)

- 6 -

The primary reason I terminated Plaintiff's employment was based on Plaintiff's ongoing failure to work as a team player, an issue which culminated in a series of combative emails sent by Plaintiff to me and other members of management in June of 2007.

(*Id*. at 334.)

Potter claims Synerlink's "official version" for her termination was based on Tarpley's notes which falsely indicated Potter had been counselled about being a team player. But this does not matter. Even if we accept as true that Tarpley lied and had not counselled Potter prior to December 2006, this fact does not negate the reason Synerlink proffers for her termination. *See Outlaw v. Newkirk,* 259 F.3d 833, 838 (7th Cir. 2001) (no genuine issue of fact when "defendants would be entitled to summary judgment even assuming the truth of [plaintiff's] version of the incident"). Thus, whether Potter was counselled during 2004, 2005, or early in 2006, does not raise a genuine dispute of material fact precluding summary judgment.

Synerlink's justification for Potter's termination relied solely on the substance of the e-mail correspondence, conversations between December 2006 and June 2007, and the reasonable inferences flowing therefrom. As a result, Tarpley's credibility regarding his notes or the number of times Potter was counselled is not the issue. When Potter was terminated, her e-mails over the previous months undeniably reflect dissatisfaction, "disappointment," and distrust. The e-mails written by both Tarpley and Potter explicitly discuss the team-player concept. Potter's e-mails further demonstrate, at least during the six months before her termination, she was not a *willing* team player – "If I'm *forced* to waive a white flag to prove I'm a team player and help my fellow TM, I *will consider*

- 7 -

doing it." (Supp. App'x Vol. I at 123-24 (emphasis added).) And while Potter argues "no reasonable juror could find that Tarpley was offended by the [June 9, 2007] e-mail," her written words show otherwise. "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*" not "the plaintiff's subjective evaluation of the situation." *E.E.O.C. v. C.R. England, Inc.,* 644 F.3d 1028, 1044 (10th Cir. 2011) (quotations and citations omitted). The e-mails, considered in their entirety, are offensive. Potter has introduced no equivalent work correspondence among or between anyone at Synerlink which would establish the content of her e-mails as normal communications between the TMs and management.

Based on the undisputed facts, no jury could reasonably find Tarpley's reasons for terminating Potter's employment were pretextual. I would affirm the judgment of the district court.

I, alone, am responsible for the delay in resolving this matter.